WO                                                                          JL

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

DaJuan Torrell Williams,                    No.  CV 18-03239-PHX-MTL (CDB)

                    Plaintiff,

v.                                          **ORDER**

Ernesto Trujillo, et al.,

                    Defendants.

Plaintiff DaJuan Torrell Williams, who is currently confined in the Yuma County Detention Center,[1] brought this civil rights action pursuant to 42 U.S.C. § 1983 against multiple Arizona Department of Corrections (ADC) officials.  Defendants Julie Bowers, Panann Days, David Shinn, and Ernesto Trujillo now move for summary judgment.  (Doc. 163.)  Plaintiff was informed of his rights and obligations to respond pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc) (Doc. 165), and he opposes the Motion.  (Doc. 188.)

The Court will grant in part and deny in part the Motion for Summary Judgment.

**I.    Background**

Plaintiff filed the original Complaint in this case on October 9, 2018.  (Doc. 1.)  In his First Amended Complaint, Plaintiff relevantly alleges that on May 9, 2018, he was transferred to ADC Special Management Unit (SMU) II and placed into an "administrative

---

[1] Currently, Plaintiff is awaiting trial in Yuma County Superior Court case #CR-2020-00289 on charges of aggravated assault against a correctional employee, aggravated assault with a deadly weapon, and prisoner in possession of contraband.  *See* https://apps.supremecourt.az.gov/publicaccess/caselookup.aspx (search by case number CR-2020-00289 in Yuma County Superior Court) (last accessed Sept. 7, 2021).

'off the books' punishment in 'dog cluster' known as 'enhanced security' and designated as 'A51.'"  (Doc. 22 at 5.)[2]  Plaintiff alleges the conditions of confinement and increased security measures in enhanced security violate the Eighth Amendment.  (*Id.*)

Plaintiff further asserts his Fourteenth Amendment due process rights were violated because he was not given prior written or verbal notice of his placement in enhanced security, was never given a written explanation for the placement, and was told there is no appeal process.  (*Id.* at 13.)  Plaintiff also alleges he remains in enhanced security and there has been no real or meaningful review of his placement, although he has not committed any disciplinary violations or engaged in aggressive, assaultive, threatening, or violent behavior since his placement in enhanced status.  (*Id.*)

On screening of the First Amended Complaint under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated Eighth Amendment conditions of confinement claims in Count One and a Fourteenth Amendment due process claim in Count Two.  (Doc. 26.)  The Court required Defendants Trujillo, Ryan, Days, and Bowers to answer Counts One and Two in their individual and official capacities.  (*Id.*)  The Court dismissed the remaining claims and Defendants.  (*Id.*)  Subsequently, the Court substituted Defendant Shinn for Defendant Ryan in his official capacity only and dismissed Defendant Ryan.  (Doc. 90.)

## II.    Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not

---

[2] The citation refers to the document and page number generated by the Court's Case Management/Electronic Case Filing system.

1    produce anything. *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099,

2    1102-03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden shifts

3    to the nonmovant to demonstrate the existence of a factual dispute and that the fact in

4    contention is material, i.e., a fact that might affect the outcome of the suit under the

5    governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable

6    jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S.

7    242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th

8    Cir. 1995).  The nonmovant need not establish a material issue of fact conclusively in its

9    favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however,

10   it must "come forward with specific facts showing that there is a genuine issue for trial."

11   *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal

12   citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

13        At summary judgment, the judge's function is not to weigh the evidence and

14   determine the truth but to determine whether there is a genuine issue for trial.  *Anderson*,

15   477 U.S. at 249.  In its analysis, the court must believe the nonmovant's evidence and draw

16   all inferences in the nonmovant's favor.  *Id.* at 255.  The court need consider only the cited

17   materials, but it may consider any other materials in the record.  Fed. R. Civ. P. 56(c)(3).

18        A trial court can only consider admissible evidence in ruling on a motion for

19   summary judgment.  *Beyene v. Coleman Sec. Servs.*, *Inc.*, 854 F.2d 1179, 1181-82 (9th Cir.

20   1988) (citing Fed. R. Civ. P. 56(e)).  Unauthenticated documents and hearsay evidence are

21   not admissible, and, consequently, may not be considered on summary judgment.  *See Orr*

22   *v. Bank of America, NT & SA*, 285 F.3d 764, 773-74 (9th Cir. 2002).  However, if the

23   *content* of a document would be admissible a trial, the Court may consider the content even

24   though the document itself may be inadmissible.  *Fraser v. Goodale*, 342 F.3d 1032, 1036-

25   37 (9th Cir. 2003); *see also Cheeks v. Gen. Dynamics*, 22 F. Supp. 3d 1015, 1027 (D. Ariz.

26   2014) (if evidence "could conceivably be converted into an admissible form for trial, the

27   Court [may] consider the evidence for the purposes of summary judgment").

28        The Ninth Circuit has held, albeit sometimes implicitly, that a non-movant's hearsay

evidence may establish a genuine issue of material fact precluding a grant of summary judgment. *See Fraser*, 342 F.3d at 1036-37; *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1028-29 (9th Cir. 2001); *Beyene*, 854 F.2d at 1182. Thus, this Court has recognized that "[m]aterial in a form not admissible in evidence may be used to *avoid*, but not to *obtain* summary judgment[.]" *Walters v. Odyssey Healthcare Mgmt. Long Term Disability Plan*, No. CV 11-00150-PHX-JAT, 2014 WL 4371284, at *3 (D. Ariz. Sep. 4, 2014) (quoting *Tetra Techs., Inc. v. Harter*, 823 F. Supp. 1116, 1120 (S.D.N.Y. 1993)); *see Lew v. Kona Hosp.*, 754 F.2d 1420, 1423 (9th Cir. 1985) (noting that at summary judgment, "we treat the opposing party's papers more indulgently than the moving party's papers").

## III.   Facts

During the relevant time, Plaintiff was in the custody of ADC. Plaintiff is serving a life sentence for first-degree murder, conspiracy to commit first-degree murder, attempt to commit first-degree murder, and first-degree burglary, among other charges. (Doc. 164-1 at 77.)

### A.   Enhanced Management Housing Status and Enhanced Security Housing

#### 1.   Before July 2019

In May 2018, when Plaintiff was placed in Enhanced Management Housing Status (EMHS) and moved to Enhanced Security Housing (ESH),[3] there were no written policies regarding placement in EMHS/ESH. (Doc. 186 at 4 ¶ 11.) According to Plaintiff, placement in ESH was "completely arbitrary and [was] simply based upon whether or not the Administration want[ed] to inflict mental and physical pain upon a specific [prisoner]." (*Id.* at 2 ¶ 7.) Plaintiff asserts that until June 2019, Defendant Trujillo, the former Northern Region Operations Director (NROD), unilaterally decided to place or remove prisoners from EMHS/EHS.[4] (*Id.* at 3 ¶ 9.)

---

[3] Since EMHS is a status for prisoners in Enhanced Security Housing, the Court will refer to them collectively as EMHS/ESH.

[4] Defendant Trujillo retired on June 30, 2019. (Doc. 164-1 at 5 ¶ 2.) In August 2019, Kevin Curran was appointed as the NROD, and he remains in that position. (Declaration of Kevin Curran, Doc. 164-1 at 128 ¶ 2.)

As relevant here, Defendant Trujillo avers in a Declaration submitted with Defendants' Motion, "Enhanced Security Housing was a security wing of housing for inmates who present[ed] exceptional security concerns by continued violations of the Forbidden Three acts," which Trujillo does not define in his Declaration. (Decl. of Ernesto Trujillo, Doc. 164-1 at 6 ¶ 4.) These prisoners were assigned to Enhanced Management Housing Status and placed in Enhanced Security Housing. (*Id.*)

Defendant Trujillo avers that during his tenure at ADC, ESH was not a custody classification or a disciplinary punishment; rather, it was a housing placement and a set of security protocols meant to safeguard other prisoners and staff from prisoners who present an exceptional security concern stemming from violent acts they have committed while in the prison system.[5] (*Id.* at 7 ¶ 9.) Thus, to be assigned to EMHS/ESH, a prisoner must have "demonstrated actions indicating either a serious escape risk or physically assaultive behavior resulting in assault or attempted assault with another with a deadly weapon, serious physical injury or death."[6] (*Id.* ¶ 5.)

Plaintiff asserts that before July 2019, no reviews were conducted of Enhanced Security Housing placement. (Doc. 186 at 4 ¶ 11.) There were no written policies requiring review of placement in Enhanced Security Housing, and prisoners were not notified of any such reviews, the dates on which they were conducted, the individuals who participated in the reviews, or the findings or determinations reached in the reviews. (*Id.*) In addition, prisoners have never been permitted to participate in any such reviews "in any manner."[7] (*Id.*)

---

[5] Department Orders 801 and 802 govern prisoner classification hearings and disciplinary procedures, respectively. (Doc. 164-1 at 7 ¶ 9.)

[6] Likewise, NROD Curran avers in his Declaration that EMHS "is not a classification or a disciplinary punishment. It is security housing meant to safeguard other inmates and prison staff from inmates who present an exceptional security concern stemming from violent acts committed while in the prison system." (Curran Decl., Doc. 164-1 at 129 ¶ 13.)

[7] Plaintiff claims that Defendants have repeatedly refused to disclose any information regarding reviews of Plaintiff's placement and have failed to submit documents or records to support their claims that Plaintiff's placement was reviewed. (Doc. 186 at 4 ¶ 11.) He argues that any "alleged reviews" that occurred before July 2019

Defendants dispute that Plaintiff's placement was not reviewed; however, Defendants have not submitted any documentary evidence of ADC's policies regarding EMHS/ESH before July 24, 2019.  Defendant Trujillo declares that before July 2019, the Regional Operations Director (ROD), Complex Warden, and unit Deputy Warden, as part of a committee,[8] "reviewed" prisoners in EMHS/ESH for program participation and step progression[9] "[at] a minimum on a quarterly basis."  (Doc. 164-1 at 7 ¶ 7.)  Defendant Trujillo avers that in conducting these reviews, the committee "consider[ed] the inmate's overall behavior, the seriousness and timeframe for the violent behavior, the length of time spent in enhanced security, whether the inmate ha[d] received any disciplinaries or exhibited any violent behavior, compliance with the STEP program, etc. when determining whether to release [an] inmate from enhanced housing."  (*Id.*)

Defendant Trujillo declares that as NROD, he "would authorize all placements into enhanced security generated from [his] assigned region and oversee the quarterly committee reviews in reference to enhanced status."  (*Id.* at 6 ¶ 3.)  Defendant Trujillo avers that during the quarterly meetings, "the decision [was] made whether to remove the inmate from enhanced status or maintain enhanced status."  (*Id.*)

### 2.   After July 2019

On July 24, 2019, ADC issued Department Order (DO) 812, which governs maximum custody management and EMHS/ESH.  (Doc. 164-1 at 134.)  DO 812 was amended on December 13, 2019.  (*Id.*)

Under the current version of DO 812, prisoners who "present exceptional security

---

were "wholly inadequate and meaningless."  (*Id.*)

[8] Plaintiff disputes the existence of an "Enhanced Security Housing Committee." (Doc. 186 at 4 ¶ 11.)

[9] Under DO 812, all prisoners in Browning Unit—whether they are in EMHS/ESH, general population, security threat group status, or condemned row, must participate in certain programs.  (Doc. 164-1 at 154.)  Prisoners in EMHS/ESH are not authorized for in-classroom programming.  (Decl. of Carla Miller, Doc. 164-2 at 6 ¶ 13.)  Prisoners in EMHS may also earn incentives and privileges as they successfully complete the Step Program. (Doc. 164-1 at 152.)  Prisoners in Browning Unit general population, security threat group status, or condemned row also participate in the Step Program, with some differences.  (*See id.* at 144-45.)

concerns," have committed "continued violations of the Forbidden Three acts" (serious assaults on staff, serious prisoner on prisoner assault with a weapon, or multiple prisoners assaulting a prisoner with a serious injury), or who are removed from the Restrictive Status Housing Program may be placed in EMHS.  (*Id.* at 140.)  As of December 13, 2019, a prisoner may be placed in EMHS/ESH if he "has demonstrated actions indicating a serious escape risk," has assaulted or attempted to assault another with a deadly weapon, or has engaged in physically assaultive behavior resulting in serious physical injury or death of any person. (*Id.*)  In addition, a prisoner may be placed in EMHS/ESH if "[t]he nature of the criminal offense committed prior to incarceration constitutes a current threat to the security and orderly operation of the institution and to the safety of others," such as first-degree murder.  (*Id.* at 141.)

Under DO 812, the decision for placement in EMHS/ESH is made by the Regional Operations Director (ROD) and the sending Complex Warden, in consultation with the receiving Complex Warden, based on the seriousness of the act and security concerns.  (*Id.*)  Within five business days of a prisoner's placement, the unit Deputy Warden sends a synopsis to another ROD, who was not involved in the initial placement.  (*Id.*)  The ROD conducts an independent review of the initial placement decision to determine if the placement meets criteria based on supporting documentation.  (*Id.*)  The prisoner has 10 calendar days from the date of advisement of the placement to file an appeal.  (*Id.*)  The appeal is reviewed by the Contract Beds Operations Director and the Security Operations Administrator.  (*Id.*)

As of December 13, 2019, the ROD, Complex Warden, and unit Deputy Warden review prisoners in EMHS/ESH for program participation and step progression a minimum of every 30 calendar days.  (*Id.*; Curran Decl., Doc. 164-1 at 130 ¶ 16.)  Among other things, the committee considers each prisoner's overall behavior, the seriousness and timeframe for the violent behavior, the length of time spent in EMHS/ESH, whether the prisoner has received any disciplinary tickets or exhibited any violent behavior, and whether the prisoner is in compliance with the Step Program.  (Curran Decl., Doc. 164-1

at 130 ¶ 18.)  These considerations inform the decision whether to release the prisoner to the general population.  (*Id.*)  The committee also may consider the Enhanced Management Spreadsheet, which includes information regarding which prisoners are housed in EMHS/ESH, why they were placed in the program, any updates to charges, recent disciplinary infractions, and current programming.  (*Id.*)  A prisoner may be moved from EMHS/ESH only by approval of the committee based on a review of the factors described above.  (*Id.* at 131 ¶ 19.)

The committee met monthly to review the status of all EMHS/ESH prisoners from September 2019 until March 2020.  (*Id.* at 130 ¶ 16.)  The meetings were temporarily stopped because of the COVID-19 pandemic; they resumed on August 6, 2020.  (*Id.*)

### B.   Conditions in ESH and Enhanced Security Measures

#### 1.   Conditions

Prisoners in ESH are generally confined to their cells except for recreation, showers, visits, and medical appointments.[10]  (Doc. 186 at 29 ¶ 106.)  ESH prisoners receive meals in their cells and eat alone.  (*Id.*)  The cells in EHS are windowless and are "roughly the size of a parking space."  (Doc. 186-1 at 8 ¶ 39.)  The light fixture remains on 24 hours per day.  (*Id.*)

Some cell fronts in ESH are enclosed and covered with plexiglass.  (*Id.* ¶ 42; Decl. of John Trent, Doc. 164-2 at 68 ¶¶ 5-6.)[11]  Plaintiff's cell was enclosed in plexiglass for the

_____

[10] ESH prisoners must complete the required programming, described above, in their cells.

[11] John Trent was a Physical Plant Supervisor II at ASPC-Eyman Browning Unit until 2019.  (Doc. 164-2 at 68 ¶ 3.)  Plaintiff objects to the Trent Declaration.  (Doc. 186 at 13.)  He asserts that Defendants have not disclosed Trent as an expert witness, and "it is unclear from the record whether his testimony is intended to be presented as 'expert testimony.'"  (*Id.*)  Plaintiff also argues that Trent's "testimony" is inadmissible under Rule 701 of the Federal Rules of Evidence.  (*Id.*)  As noted above, the Court may consider the content of a document in deciding a motion for summary judgment, even if the document itself may be inadmissible.  Moreover, the Trent Declaration is based on Trent's personal knowledge derived from his role as a Physical Plant Supervisor II and his participation in the 2014 study.  Thus, the Court may consider the content of the Trent Declaration and exhibits thereto.  *See Block v. City of Los Angeles*, 253 F.3d 416, 419 (9th Cir. 2001) (explaining that a court may consider declarations for purposes of summary judgment only if they are made on personal knowledge and sets out facts that would be admissible in evidence).

first nine or ten months of his placement in ESH.  (*Id.*)  There is a four-inch gap at the bottom of the cell door, but Plaintiff claims the gap does not allow air to leave the cells.  (Trent Decl., Doc. 164-2 at 68 ¶ 5; Doc. 186 at 12; Doc. 186-1 at 9 ¶ 33.)  Plaintiff explained that neither the cell front nor the plexiglass was "lined" with any other holes or means to allow for proper air circulation.  (Doc. 186-1 at 9 ¶ 44.)

According to the Trent Declaration, however, the plexiglass front is lined with several holes by which air can escape the cell.  (Trent Decl., Doc. 164-2 at 68 ¶ 5.)  Defendant Trujillo and NROD Curran aver in their Declarations that some cell fronts in ESH are lined with plexiglass to prevent prisoners from throwing feces, sharp objects, water, or other items at prison staff as they walk by the cells.[12]  (Trujillo Decl., Doc. 164-1 at 8 ¶ 11; Curran Decl., Doc. 164-1 at 130 ¶ 15.)

The cells in ESH contain "altered" ventilation systems that are different from the ventilation systems in other cells.  (Doc. 186-1 at 9 ¶ 45.)  The general population cells contain a 14 square inch air vent located near the ceiling of the cells.  (*Id.*)  In ESH cells, this vent has been covered up and welded over with a steel plate, and a 14 x 4 inch air vent has been manufactured and placed under a table near the floor of the cell.  (*Id.*)  Plaintiff alleges the altered ventilation system decreases air flow into ESH cells, and hot, stale, and humid air never leaves the cell.  (*Id.*)  At times, exhaust fumes from the prison's transport and security vehicles or vendor delivery trucks, or a "fishy" smell resulting from issues with the swamp coolers or pumps or when maintenance was changing or watering the filters, would permeate Plaintiff's cell.  (*Id.* ¶ 47.)  The fumes caused Plaintiff to suffer nausea and headaches, and he tied a towel over his mouth and nose "for hours" until the fumes dissipated.  (*Id.*)

According to the Trent Declaration, there is continuous air flow in each cell at Eyman-Browning regardless of whether the cell is for maximum custody general population prisoners or prisoners housed in EMHS/ESH.  (*Id.*)  In 2014, Trent participated

---

[12] Plaintiff disputes this rationale for the plexiglass cell fronts.  (Doc. 186-1 at 8-9 ¶ 43.)

in a study to determine the approximate amount of air flow for cells lined with plexiglass located in both maximum custody general population and Enhanced Security Housing at Eyman-Browning.[13]  (Trent Decl., 164-2 at 67-69, ¶¶ 2, 8-9.)  As part of the study, ADC staff checked the air flow on a random number of cells from both upstairs and downstairs in several clusters throughout the prison.  (*Id.* at 69 ¶ 8.)  It was determined that maximum custody general population cells receive approximately between 250 and 300 cfm.  (*Id.*)  With respect to plexiglass cell fronts, ADC staff measured the plexiglass front cells with an anemometer and determined there was no significant change in air flow.  (*Id.* ¶ 9.)  The plexiglass cells maintained between 250 to 300 cfm per cell.[14]  (*Id.*)

Plaintiff's asserts that while his cell was lined with plexiglass, temperatures in his cell "were inhumanely hot" and caused him difficulty breathing, lethargy, agitation, anger, and depression.  (Doc. 186 at 13-14.)  Plaintiff further explains that the conditions caused him to "become angry" and want to "lash out" at others, and he was "constantly dripping with sweat.  (*Id.* at 14.)  He believed the common range of temperatures in his pod during the summer and fall months was high 80s to mid-90s.  (Doc. 186-1 at 9 ¶ 48.)  According to Plaintiff, prison administration does not take action or is "slow to take action" to relieve the conditions in ESH cells "unless and until the temperature exceeds 95 degrees."  (*Id.* at 10 ¶ 48.)  After the plexiglass was removed in December 2019 or January 2020, Plaintiff could breathe normally and could feel the air moving and circulating.  (*Id.* at 10 ¶ 49; Doc. 186 at 14.)  Plaintiff also could hear "what was going on around him" and could communicate with others.  (Doc. 186 at 14; Doc. 186-1 at 10 ¶ 49.)

John Trent declares that the average temperature in the cells at Eyman-Browning, including Enhanced Security Housing, can change according to the humidity level.  (Trent Decl., Doc. 164-2 at 69 ¶ 10.)  The average temperature in the cells was approximately the

---

[13] Plaintiff disputes the relevance of a 2014 study to the conditions he experienced from 2018 to 2020.  (Doc. 186 at 13 ¶ 36.)

[14] Pursuant to the Plant Physical Standards Technical Manual, effective March 5, 2019, close and maximum custody housing units must receive a minimum of 40 cubic feet per minute ("cfm") outside air per cell.  (Doc. 164-2 at 84.)  There must be a minimum exhaust of 100 cfm from each cell.  (*Id.*)

same throughout Eyman-Browning.  (*Id.* ¶ 11.)  This includes the temperature in open air cells and plexiglass fronted cells.  (*Id.*)  The average temperature in the cells was 78 degrees Fahrenheit, though temperatures could rise as high as 85 degrees Fahrenheit if there were high humidity levels.  (*Id.*)  According to the Trent Declaration, if temperatures reached any higher than 85 degrees Fahrenheit it would "likely be due to a system breakdown," and as soon as ADC staff was made aware of the problem, "the system breakdown would be fixed immediately."[15]  (*Id.*)

## 2. Enhanced Security Measures

Prisoners in EMHS/ESH are subject to enhanced security protocols, including full restraints, to include a lead chain and camera, for all out of cell movement.  (Doc. 164-1 at 141; Curran Decl., Doc. 164-1 at 129 ¶ 14.)  Previously, EMHS/ESH prisoners were placed on a gurney when they were escorted around the facility, except when they were escorted to the showers or recreation enclosure.  (*Id.*; Decl. of Sean Lopez, Doc. 164-1 at 167-68 ¶ 7.)  Defendant Trujillo implemented the use of gurneys in ESH in 2013 or 2014; according to Plaintiff, Trujillo did so although he knew strapping prisoners face down to a gurney could result in death or serious physical injury, and ADC policies forbade strapping prisoners face down to a gurney.  (Doc. 186 at 10 ¶ 29.)

During movement around the unit, EMHS/ESH prisoners were required to sit on the gurney and lay face down on their stomachs.  (*Id.* at 9 ¶ 27.)  Straps were placed across prisoners' backs and the backs of their legs.  (*Id.*)  COs took hold of the straps attached to each end of the gurney to drag it around the unit.  (*Id.*)  Prisoners were "dragged around the unit, face down and feet first, on a gurney for all movement around the unit."  (*Id.*)  The gurney was never raised more than two or three feet from the ground.  (*Id.*)  The gurneys in ESH were never cleaned, sanitized, or properly maintained.  (*Id.* at 10 ¶ 28.)  The same gurneys were always used consecutively without the gurneys being cleaned, wiped down, or sanitized in any manner.  (*Id.*)

---

[15] Defendants have not produced any evidence regarding the frequency of system breakdowns, the length of time it took to repair any such breakdowns, or how high the temperature in the cells reached during any such breakdowns.

1   NROD Curran avers that the gurney was used as an added mechanical restraint to
2   limit a prisoner's mobility if he attempted to attack another prisoner or staff member.
3   (Curran Decl., Doc. 164-1 at 129 ¶ 14.)  Sean Lopez, a Sergeant in Enhanced Security
4   Housing since July 2019, avers that there were two gurneys in the EMHS/ESH wing.
5   (Lopez Decl., Doc. 164-1 at 168 ¶ 7.)  The gurneys were immediately wiped down and
6   cleaned after every use by a prisoner, and the same gurney was never used consecutively
7   unless it had already been thoroughly wiped down and cleaned by members of the prison
8   staff.  (*Id.*)  ADC stopped using gurneys to transport prisoners in EMHS/ESH in December
9   2019 or January 2020.  (*Id.*)

10   The current added security protocols in EMHS/ESH include use of a lead chain and
11   lower leg restraints when escorting prisoners to the shower area, recreation enclosure,
12   health unit, or visitation center.  (*Id.* at 167 ¶ 6.)  The lead chain is a three-foot metal chain
13   equipped with a triangular lock that can be placed on the cell prior to the cuffs being placed
14   on the prisoner.  (*Id.*)  The lead chain is attached to the prisoner's cuffs during escort.  (*Id.*)

15   Another extra security protocol requires the presence of a supervisor along with at
16   least two other members of the prison staff during movement.  (*Id.* ¶ 9.)  The escorting
17   officer escorts the prisoner from behind to maintain control of the prisoner.  (*Id.*)  A
18   supervisor and two additional staff members are present when escorting an EHS prisoner
19   to and from the showers, recreation enclosure, visitation center, and health unit.  (*Id.*)

20   Because of the movement procedures in ESH, prisoners are often left standing in
21   the shower for two hours or more.  (Doc. 186-1 at 20 ¶ 94.)  Prisoners can "yell" for the
22   COs when their showers are complete, however, according to Plaintiff, "this rarely
23   produces results."  (Doc. 186 at 7 ¶ 23.)  The floor CO cannot take an EMHS/ESH prisoner
24   out of the shower until a supervisor and other COs are present.  (*Id.*)  As a result,
25   EMHS/ESH prisoners spend "extended and prolonged periods of time locked and standing
26   in shower enclosures," where they cannot "sit or lean on anything for relief."  (*Id.*)

27   Sergeant Lopez declares that EMHS/ESH prisoners take approximately 15 to 20
28   minutes showers and can communicate with staff once the shower has concluded.  (Lopez

Decl., Doc. 164-1 at 169 ¶ 11.)  Lopez avers that prisoners in ESH can communicate with staff after their showers have concluded through an "opening" in the shower.  (*Id.*)  Lopez declares that in an emergency where prison staff is not immediately available to escort a prisoner back to his cell after a shower, a prisoner could spend, at most, between 30 and 40 minutes in the shower, including the time already spent showering.  (*Id.*)  The same process for transporting a prisoner to the shower is employed with respect to returning him to his cell.  (*Id.*)

Prisoners in EMHS/ESH are allowed three 2.5-hour blocks for recreation in the standard recreation enclosure.  (*Id.* at 169 ¶ 12.)  When escorting a prisoner to the recreation enclosure for outdoor activity, the prisoner is first strip searched.  (*Id.*)  After the strip search, the prisoner is placed in cuffs attached to the lead chain.  (*Id.*)  The prisoner is then placed in the lower leg restraints and escorted to the recreation enclosure.  (*Id.*)  The recreation enclosure is directly attached to the pod where EMHS/ESH prisoners are housed at Eyman-Browning.  (*Id.*)

The recreation pens are solid, four-walled rectangular structures measuring approximately 18 feet by 10 feet.  (Doc. 186-1 at 17 ¶ 81.)  The pens have 20-foot cement walls with a stainless-steel grille welded and bolted on top.  (*Id.*)  According to Plaintiff, temperatures in the recreation pens regularly reach and exceed 100 degrees, especially from April to November.  (*Id.* ¶ 82.)  From June through September, temperatures regularly reach and exceed 105 to 110 degrees.  (*Id.*)

Recreation pens are not equipped with running water or restroom facilities.  (*Id.*)  Although staff generally conduct health and welfare and security checks every hour or so, at times, staff only conduct checks every three hours for "rec turns," when staff take prisoners in or out of recreation.  (*Id.* ¶ 83.)  ESH prisoners are told that if they go out to recreation, they must remain there for the full three hours.  (*Id.*)  Plaintiff states he has been at recreation on multiple occasions where staff did not conduct a check during the entire three hours Plaintiff was at recreation.  (*Id.*)  Prisoners can only bring a 32-ounce water bottle into the recreation pens, and there is no other running water available.  (*Id.* ¶ 84.)

1   Sergeant Lopez declares that a prisoner who has run out of water can request that an officer

2   refill the bottle, or jugs of water will be made available.  (Lopez Decl., Doc. 164-1 at 169

3   ¶ 12.)

4          Plaintiff also alleges that although none of the recreation pens have restrooms, ESH

5   prisoners are not afforded timely or reasonable access to restrooms during recreation.

6   (Doc. 186-1 at 19 ¶ 90.)  As a result, he contends, prisoners are forced to urinate in soda or

7   shampoo bottles or bags if they are available, but usually, prisoners simply urinate on the

8   ground or in the corners of the recreation pens.  (*Id.* ¶ 92.)  Further, ESH prisoners are also

9   forced to defecate in bags while in the recreation pen, although Plaintiff avers this occurs

10   less frequently.  (*Id.*)  If a prisoner goes to the restroom during recreation, he forfeits the

11   remainder of his recreation/out-of-cell time.  (*Id.* ¶ 91.)

12          Sergeant Lopez declares that a prisoner in the recreation enclosure can request to

13   use the restroom when prison staff are conducting a check.  (Lopez Decl., Doc. 164-1 at

14   169 ¶ 12.)  The prisoner will be escorted back to the housing pod in the presence of the

15   supervisor and two additional staff members to use the restroom facilities.  (*Id.*)  If there is

16   still time remaining for the prisoner's recreation, he will be escorted back to the recreation

17   enclosure.  (*Id.*)

18          **C.     Plaintiff's Placement in EMHS/EHS**

19          From April 9, 2018 until May 9, 2018, Plaintiff was confined in ASPC-Yuma

20   Dakota Unit, a level 4 (close custody) facility.  (Doc. 186 at 1 ¶ 5.)  On May 8, 2018,

21   Plaintiff was involved in an incident in which he entered the dining hall at ASPC-Yuma

22   Dakota Unit, approached an officer, and punched the officer in the face.  (Doc. 164-1 at

23   98.)  Officers responded, and Plaintiff was sprayed with chemical agents and secured in

24   handcuffs behind his back.[16]  (Doc. 186 at 4 ¶ 18.)  Sergeant Villanueva escorted Plaintiff

25   _____

26          [16] The record includes a number of reports regarding the May 8, 2018 assaults,
     including a Significant Incident Report and a Use of Force/Incident Command Report
27   written by Lieutenant Jesus Vizcarra, who responded to the Incident Command; a Use of
     Force Report/Incident Command Report Continuation Sheet written by CO II Escalante,
28   one of the officers who was assaulted; a Use of Force/Incident Command Report
     Continuation Sheet written by CO II Luna, the other officer who was assaulted; and various
     Use of Force/Incident Command Report Continuation Sheets written by officers who

to Dakota Detention Unit.  (*Id.*)  Plaintiff was never placed on report or "given any type of notice" regarding the May 8, 2018 assaults until he received a disciplinary report on May 17, 2018.  (*Id.* at 5 ¶ 24.)

On May 9, 2018, the day after the assaults, Plaintiff was moved to ASPC-Eyman Browning Unit and placed in Enhanced Security Housing.[17]  (*Id.* at 6 ¶ 31.)  According to Plaintiff, he was placed into Enhanced Security Housing "at the sole discretion and determination[]" of Defendant Trujillo.  (Doc. 186 at 1 ¶ 5; Trujillo Decl., Doc. 164-1 at 5 ¶ 2; Doc. 164-1 at 82).  Defendant Trujillo disputes this and avers that after learning about the assaults, he made the determination, "in coordination with" SROD Profiri, Warden Hacker-Agnew, the receiving Warden at Eyman-Browning, and Defendant Days, that sending Plaintiff to Enhanced Security Housing at Eyman-Browning "based on his aggressive and violent behavior towards prison staff was most appropriate."  (Trujillo Decl., Doc. 164-1 at 9 ¶ 16.)  Plaintiff asserts that he did not receive prior notice of his placement or an opportunity to present his views regarding his placement; Defendants do not contradict this assertion.  (Doc. 22 at 13.)

Plaintiff was subsequently charged with "Attempt to Commit a Class A Offense" and two separate charges of "Aggravated Assault: Inmate on Staff."  (Doc. 164-1 at 117-19.)  Disciplinary hearings were held on May 18, 2018 and May 25, 2018, during which Plaintiff was found guilty of the violations, and the charges were upheld.  (Doc. 164-3 at 93-94.)  As part of his punishment for the convictions, Plaintiff lost earned release credits, privileges, and visits.  (*Id.* at 93.)  However, his placement in EMHS/ESH was not among the penalties for his disciplinary convictions.  (*Id.*)  On June 22, 2018, Plaintiff's Appeal was denied.  (*Id.* at 95.)  On July 12, 2018, Plaintiff's Second Level Disciplinary Appeal was denied.  (*Id.* at 97.)

According to Plaintiff, his placement in EMHS was not reviewed until July 2019.[18]

responded to the Incident Command.  (Doc. 164-1 at 100-116.)

[17] Plaintiff states that he was moved to the level 5 Supermax Special Management Unit II (SMU II) at ASPC-Eyman.  (Doc. 186-1 at ¶ 31.)

[18] Plaintiff asserts that until documents regarding a review of his EMHS/ESH

(Doc. 186 at 22 ¶ 67.)  Defendants dispute this and assert that between the time Plaintiff was placed in Enhanced Security Housing in May 2018 and the adoption of Department Order 812 in July 2019, his enhanced status was reviewed by a committee, which consisted of NROD Trujillo, the Complex Warden, unit Deputy Warden, and other ADC staff members as available on a quarterly basis.  (Trujillo Decl., Doc. 164-1 at 9 ¶ 17.)

As of April 25, 2019, Plaintiff had completed Step II programing and was eligible for advancement to Step III.  (Doc. 164-1 at 163.)  Defendant Trujillo states that his last review of Plaintiff's placement in EMHS/ESH occurred on June 21, 2019.  (Trujillo Decl., Doc. 164-1 at 9 ¶ 19.)  Defendant Trujillo declares that Assistant Deputy Warden Romney, Captain Dolejsi, Captain Decker, Correctional Officer IV (CO IV) Van Winkle, and CO III De La Cruz were also present for the committee meeting.[19]  (*Id.*)  Other than Defendant Trujillo's generic description of the review that occurred on June 24, 2019, Defendants do not describe any review of Plaintiff's placement, including when any review occurred, who participated in the review, the reasons Plaintiff's placement continued, or whether Plaintiff was notified of or permitted to participate in the reviews.

Evidence submitted by Defendants indicates that after the adoption of DO 812 in July 2019, the committee reviewed prisoner placement in Enhanced Security Housing on September 5, 2019; October 3, 2019; November 14, 2019; December 6, 2019; January 2, 2020; February 6, 2020; and March 5, 2020.  (Doc. 164-1 at 162-63.)  Defendant Days was present for each meeting through February 6, 2020.  (*Id.* at 163.)

### D.    Plaintiff's Maximum Custody Reclassification

On August 16, 2018, Plaintiff was given a Notice of Hearing and Inmate Rights (Proposed Maximum Custody Placement).  (Doc. 164-3 at 111.)  The Notice indicated the recommendation was based on Plaintiff's "proven behavior," that is, that Plaintiff had "demonstrated physical or sexually assaultive behavioral categories resulting in either

---

placement were produced during discovery in this case, he had no notice or knowledge of "this alleged review," and he was not allowed to participate in the review or told the outcome.  (Doc. 186 at 22 ¶ 67.)

[19] A redacted spreadsheet submitted with Defendant Trujillo's Declaration indicates that DWOP Smith-Whitson also was present for the meeting.  (Doc. 164-1 at 125.)

serious physical injury or death to any person." (*Id.*)  On August 20, 2018, Defendant Days recommended maximum custody placement due to Plaintiff's "aggressive assaultive behavior," including aggravated assault on staff with a weapon.  (*Id.* at 114.)  Defendant Days noted that Plaintiff was "currently housed in Enhanced Program." (*Id.*)  On August 23, 2018, Warden S. Morris approved the maximum custody placement.  (*Id.*)

Plaintiff was officially reclassified to maximum custody on September 11, 2018. (*Id.*; Doc. 164-1 at 93.)   Plaintiff appealed his placement in maximum custody on November 2, 2018.  (Doc. 164-3 at 120.)  Plaintiff stated in his appeal that he had been sent to SMU II and locked down in maximum custody for more than 100 days without any notice, a hearing or other opportunity to be heard, or any review of his placement.  (*Id.*)

On December 3, 2018, OSB Administrator Stacey Crabtree denied Plaintiff's appeal, finding that Plaintiff was "correctly classified to maximum custody" based on his classification score. (*Id.* at 119.)  Crabtree stated that Plaintiff's score was "based in large part on the seriousness of [his] offenses and/or serious disciplinary history." (*Id.*)

On March 4, 2019, Plaintiff received a Notice of Hearing and Inmate Rights (Proposed Maximum Placement). (*Id.* at 130.)  The Notice stated that Plaintiff had been "placed into Enhanced Security at Browning Unit by Committee," and within the previous year, Plaintiff had assaulted a staff member with closed fist strikes and had assaulted another staff member with a prison made weapon.  (*Id.*)  The Notice stated that Plaintiff had "shown a recent and severe violent history toward staff." (*Id.*)

Plaintiff submitted a written statement before his reclassification hearing, in which he wrote that Enhanced Security "is not a part of and is outside the scope of classification." (*Id.* at 131.)   On March 6, 2019, at the reclassification hearing, ADC staff recommended that Plaintiff be retained in maximum custody.[20]  (*Id.* at 128.)  The recommendation was

---

[20] On March 10, 2020, Plaintiff was charged in Yuma County Superior Court case # CR-202000289 with one count each of prisoner possession of contraband, aggravated assault with a deadly weapon, and aggravated assault against a correctional employee. Plaintiff has been "out to court" and in custody in the Yuma County Jail since April 20, 2020.  (Doc. 164-1 at 83.)

1   based on the May 8, 2018 assaults.[21]   (*Id.*)

2          On March 11, 2019, ADW Alejandro Sanchez recommended that Plaintiff be

3   retained in maximum custody.  (*Id.* at 127.)  On March 12, 2019, Warden Smith-Whitson

4   approved the recommendation "based on aggravated assault tickets less than a year ago."

5   (*Id.*)  Plaintiff was officially reclassified to maximum custody on March 18, 2019.  (Doc.

6   164-1 at 93.)   On June 26, 2019, Plaintiff appealed his reclassification to maximum

7   custody.  (Doc. 164-3 at 133.)  On August 23, 2019, his appeal was denied.  (*Id.* at 135.)

8          Subsequently, Plaintiff's placement in maximum custody was reviewed on April

9   25, 2019; September 16, 2019; December 9, 2019; January 9, 2020; February 8, 2020.

10  (Doc. 164-1 at 93.)  On March 18, 2020, the last review before he was moved to the Yuma

11  County Jail for his pending trial, Plaintiff was reclassified to maximum custody.  (*Id.*)

12  **IV.     Fourteenth Amendment Claims**

13          **A.     Legal Standards**

14          The Supreme Court has explained that although "prisoners do not shed all

15  constitutional rights at the prison gate," "'[l]awful incarceration brings about the necessary

16  withdrawal or limitation of many privileges and rights, a retraction justified by the

17  considerations underlying our penal system.'"  *Sandin v. Conner*, 515 U.S. 472, 485 (1995)

18  (quoting *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 125 (1977)).

19  Thus, only some placements implicate due process and require notice and an opportunity

20  to be heard and non-adversarial review of the evidence supporting the placement.

21          The Supreme Court in *Sandin* rejected the argument that any state action taken for

22  a punitive reason encroaches upon a liberty interest under the Due Process Clause even in

23  the absence of any state regulation.  *Id.* at 484.  Rather, prisoners have liberty interests

24  protected by the Due Process Clause only where the contemplated restraint "imposes

25  _____

26          [21] Specifically, the rationale for placement stated that Plaintiff had been placed into
    Enhanced Security at Browning Unit by Committee, and within the last year, Plaintiff had
27  assaulted one staff member with closed fist strikes and another staff member with a prison
    made weapon.  (Doc. 164-3 at 128.)  The rationale further stated that while Plaintiff was
28  being escorted after the assaults, he yelled and "attempted to incite inmates to continue to
    assault staff members."  (*Id.*)  The rationale concluded, "Inmate has shown a recent and
    severe violent history toward staff."  (*Id.*)

atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* To determine the existence of atypical and significant hardships, the Court considers "1) whether the challenged condition 'mirrored those conditions imposed upon inmates in administrative segregation and protective custody,' and thus comported with the prison's discretionary authority; 2) the duration of the condition, and the degree of restraint imposed; and 3) whether the state's action will invariably affect the duration of the prisoner's sentence." *Ramirez v. Galaza*, 334 F.3d 850, 861 (9th Cir. 2003) (citations omitted).

In *Wilkinson v. Austin*, 545 U.S. 209 (2005), the Supreme Court observed that after *Sandin*, "it is clear that the touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is not the language of regulations regarding those conditions but the nature of those conditions themselves 'in relation to the ordinary incidents of prison life.'" *Id.* at 223 (quoting *Sandin*, 515 U.S. at 484). The Supreme Court observed that the Courts of Appeals have not reached consistent conclusions for identifying the baseline from which to measure what is atypical and significant in any particular prison system, but the Court concluded that it need not resolve that issue, because the Court was "satisfied that assignment to [the Ohio State Penitentiary, a Supermax facility] imposes an atypical and significant hardship under any plausible baseline." *Id.*[22] The Supreme Court held that prisoners had a protected liberty interest in

---

[22] The Supreme Court in *Wilkinson* described the conditions at the Ohio Supermax facility as follows:

> For an inmate placed in OSP, almost all human contact is prohibited, even to the point that conversation is not permitted from cell to cell; the light, though it may be dimmed, is on for 24 hours; exercise is for 1 hour per day, but only in a small indoor room. Save perhaps for the especially severe limitations on all human contact, these conditions likely would apply to most solitary confinement facilities, but here there are two added components. First is the duration. Unlike the 30–day placement in *Sandin,* placement at OSP is indefinite and, after an initial 30–day review, is reviewed just annually. Second is that placement disqualifies an otherwise eligible inmate for parole consideration.

545 U.S. at 223-24.

1  avoiding assignment at the Ohio Supermax facility.  *Id.* at 220-21.

2          **B.**      **Discussion of Placement in EMHS/ESH**

3              **1.**      **Liberty Interest**

4       In their Motion, Defendants argue that Plaintiff's placement in Enhanced Security

5  Housing did not implicate any liberty interest of Plaintiff.  (Doc. 163 at 18.)  They describe

6  Enhanced Security Housing as additional security measures applied to the "most violent

7  and dangerous inmates" in a maximum custody facility.  (*Id.* at 2.)  Defendants contend

8  that "the only real differences between [Plaintiff's] enhanced housing status and that of

9  maximum custody inmates in general population pertains to the heightened level of

10  security protocols [Plaintiff] is subject to as a result of his previous violent behavior."  (*Id.*

11  at 23.)  Defendants assert that the purpose of using enhanced security measures was not to

12  punish Plaintiff, but to provide extra security protocols and separate housing for prisoners

13  who pose a heightened security risk because of their violent actions in the prison.  (*Id.*)

14       With respect to the first *Sandin* factor, the Ninth Circuit has suggested

15  that conditions of confinement which violate the Eighth Amendment constitute "atypical

16  and significant hardship."  *See Keenan v. Hall*, 83 F.3d 1083, 1089 (9th Cir. 1996).

17  However, the *Sandin* test is not synonymous with an Eighth Amendment violation: "[w]hat

18  less egregious condition or combination of conditions or factors would meet the test

19  requires case by case, fact by fact consideration."  *Id.*  The Ninth Circuit has further

20  explained that "*Sandin* requires a factual comparison between conditions in general

21  population or administrative segregation (whichever is applicable) and disciplinary

22  segregation, examining the hardship caused by the prisoner's challenged action in relation

23  to the basic conditions of life as a prisoner."  *Jackson v. Carey*, 353 F.3d 750, 755 (9th Cir.

24  2003).

25       In this case, there are genuine disputes of material fact regarding the conditions in

26  ESH and Plaintiff's cell specifically, as well as the use of increased security protocols.  In

27  particular, Plaintiff has adduced evidence that the four-inch gap at the bottom of his cell

28  door did not allow air to leave the cells, and neither the cell front nor the plexiglass was

"lined" with any other holes or means to allow for proper air circulation. In addition, Plaintiff has submitted evidence that the cells in ESH contain "altered" ventilation systems; the normal 14 square inch vent has been covered up and welded over with a steel plate, and a 14 x 4 inch air vent has been manufactured and placed under the table near the floor of the cell.

Plaintiff has also adduced evidence that he perceived the temperatures in his cell to be "inhumanely hot" in his plexiglass-fronted cell between the months of May to November, that the common temperature range for cells in the ESH pod was "high 80's, low to mid-90's," and that prison administration was slow to take action unless the temperature exceeded 95 degrees. In contrast, Defendants assert that ESH and maximum custody general population prisoners "receive the same ventilation air flow."[23] (Doc. 163 at 23.) But the evidence cited for this assertion relates to the general conditions in ESH cells and does not contradict Plaintiff's evidence regarding the conditions in his cell.

Plaintiff has also adduced evidence that for most of his time in ESH, prisoners were escorted around the unit on a gurney. ESH prisoners were required to sit on the gurney and lay face down on their stomachs, and straps were placed across prisoners' backs and the backs of their legs, securing them to the gurney. Accepting Plaintiff's description of the conditions and enhanced security measures as applied to him, a reasonable jury could conclude that the conditions he experienced constituted an atypical and significant hardship. The first factor weighs in favor of finding a protected liberty interest.

Moreover, to the extent that Defendants argue that none of the conditions in ESH implicate the Due Process Clause, the Supreme Court in *Wilkinson* explained that although any particular condition "standing alone might not be sufficient to create a liberty interest, taken together [the conditions may] impose an atypical and significant hardship within the

---

[23] Defendants also argue that the conditions of ESH prisoners at Eyman-Browning with respect to programming and incentives "largely mirror the conditions of inmates in maximum custody general population, security threat groups, and on condemned row." (Doc. 163 at 19.) The Court agrees that these conditions, even if they are different in ESH, do not implicate the Due Process Clause because they do constitute the type of "atypical and significant hardship" in relation to the "ordinary incidents of prison life."

correctional context."  545 U.S. at 224.  In addition, even if it is true that the "harsh conditions" in ESH were "necessary and appropriate in light of the danger that high-risk inmates pose both to prison officials and to other prisoner," that necessity "does not diminish [the] conclusion that the conditions give rise to a liberty interest in their avoidance." *Id.*

The second *Sandin* factor requires the Court to consider the duration of Plaintiff's placement in ESH and the degree of restraint imposed in ESH.  Defendants correctly point out that "the duration in administrative segregation for even a substantial period of time does not in and of itself constitute an 'atypical hardship.'"  (Doc. 163 at 24.)  In *Brown v. Oregon Dep't of Corrections*, 751 F.3d 983 (9th Cir. 2014), the Ninth Circuit noted that the plaintiff's 27-month confinement in the IMU without meaningful review "'impose[d] atypical and significant hardship on [him] in relation to the ordinary incidents of prison life.'"  *Id.* at 987.  The Ninth Circuit also noted that confinement in the IMU subjected the plaintiff to solitary confinement for over twenty-three hours each day with almost no interpersonal contact and denied him most privileges afforded prisoners in the general population.  *Id.* at 988.  The Ninth Circuit recognized that although "these conditions alone might apply to most solitary-confinement facilities," there was a "crucial factor distinguishing confinement in the IMU: the duration of [the plaintiff's] confinement."  *Id.* (citing *Hutto v. Finney*, 437 U.S. 678, 686 (1978) ("[T]he length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards.")).

Here, it is undisputed that Plaintiff was in ESH from May 9, 2018 until he was transferred to the Yuma County Jail in April 2020, and he remains assigned to ESH.  As noted above, Plaintiff's placement in ESH was not reviewed in any context until August 2018, when he was officially reclassified to maximum custody.  In addition, for more than 18 months after his placement in ESH, Plaintiff was subjected to harsh conditions and increased security measures.  Thus, the second factor weighs in favor of finding a liberty interest in this case.

Finally, regarding the third *Sandin* factor, it is undisputed that Plaintiff's placement

in ESH will not "invariably affect the duration of his sentence."  *Sandin*, 515 U.S. at 483-84.  This factor weighs against finding a liberty interest.

The Court concludes Plaintiff's placement in EMHS/ESH implicated a protected liberty interest.  The Court will therefore consider what process was due to Plaintiff and whether he received that process before he was placed in EMHS/ESH.

## 2.    Required Procedures

As the Supreme Court observed in *Wilkinson*, "because the requirements of due process are 'flexible and cal[l] for such procedural protections as the particular situation demands,'" the Court has generally "declined to establish rigid rules and instead ha[s] embraced a framework to evaluate the sufficiency of particular procedures."  545 U.S. at 224 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)).  The Court applies the framework established in *Mathews v. Eldridge*, 424 U.S. 319 (1976), which requires consideration of three distinct factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335.  "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'"  *Mathews*, 424 U.S. at 333 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).

In *Hewitt v. Helms*, 459 U.S. 460, 476-77 & n.9 (1983), *abrogated in part on other grounds by Sandin*, 515 U.S. 472, the Supreme Court held that due process requires (1) an informal, non-adversary evidentiary review sufficient both for the decision that a prisoner represents a security threat and the decision to confine a prisoner to administrative segregation pending completion of an investigation into misconduct charges against him, (2) some notice of the charges against him and an opportunity to present his views, and (3) periodic review of the confinement.  459 U.S. at 476-77 & n.9; *see also Toussaint v.*

*McCarthy*, 801 F.2d 1080 (9th Cir. 1986) (holding that that prison officials must engage in some sort of periodic review of the confinement of prisoners held in administrative segregation).

In *Wilkinson*, the Supreme Court concluded that "[w]here the inquiry draws more on the experience of prison administrators, and where the State's interest implicates safety of other prisoners and prison personnel, the informal, non-adversary procedures" set forth in *Hewitt* "provide the appropriate model."  545 U.S. at 227.

The evidence in the record demonstrates that Plaintiff was placed in EMHS/ESH on May 9, 2018 because he had assaulted two prison staff members the day before.  Thus, the state's interest in placing Plaintiff in EMHS/EHS implicated the safety of other prisoners and prison personnel.  Accordingly, Plaintiff was entitled only to an informal, non-adversary procedure before his placement in EMHS/EHS.

Plaintiff asserts that he was placed into EMHS/ESH "at the sole discretion and determination[]" of Defendant Trujillo; Plaintiff had no prior notice of his placement and did not have an opportunity to be heard.  Defendants have not submitted any evidence that contradicts Plaintiff's assertions that he did not receive notice or an opportunity to be heard before his placement.  Although Defendants state that other officials were involved in the decision to place Plaintiff in EMHS/EHS, they have not submitted Declarations from any of the other individuals who were involved in the initial decision or any evidence specifically establishing how the decision was made and how Plaintiff was able to participate in the process.

Furthermore, Defendants have not submitted any documentary evidence regarding reviews of Plaintiff's placement that occurred before his August 2018 reclassification to maximum custody.  As noted above, Defendants cite only Defendant Trujillo's Declaration to support the assertion that EMHS placement was reviewed quarterly before July 2019, but the Declaration does not describe the procedures for such reviews or any reviews of Plaintiff's placement, and Defendants have not submitted any documentary evidence regarding the reviews.

Thus, the Court finds there is a genuine dispute of material fact regarding whether Plaintiff's initial placement in EMHS/EHS comported with due process, as well as whether Plaintiff received any review of his placement until August 2018, when he was classified to maximum custody. The Court will therefore deny Defendants' Motion for Summary Judgment as to Plaintiff's Fourteenth Amendment due process claim regarding his placement in EMHS/ESH against Defendant Trujillo in his individual capacity and Defendant Shinn in his official capacity only. Because there is no evidence that Defendants Bowers and Days were personally involved in the decision to place Plaintiff in EMHS/ESH, the Court will dismiss the due process claims as to them.

**V.     Eighth Amendment Claims**

Plaintiff also contends the conditions of confinement in ESH and maximum custody violate the Eighth Amendment. To prevail on an Eighth Amendment conditions-of-confinement claim, a plaintiff must meet a two-part test. "First, the alleged constitutional deprivation must be, objectively, sufficiently serious" such that the "official's act or omission must result in the denial of the minimal civilized measure of life's necessities." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotations omitted). Second, the prison official must have a "sufficiently culpable state of mind," i.e., he must act with "deliberate indifference to inmate health or safety." *Id.* (internal quotations omitted).

Deliberate indifference is a higher standard than negligence or lack of ordinary due care for the prisoner's safety. *Id.* at 835. In defining "deliberate indifference" in this context, the Supreme Court has imposed a subjective test: "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and* he must also draw the inference." *Id.* at 837 (emphasis added).

"Because routine discomfort is part of the penalty that criminal offenders pay for their offenses against society, only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *McMillian*, 503 U.S. at 9 (internal quotations and citations omitted). "[T]he unnecessary and wanton infliction of pain ... constitutes cruel

1   and unusual punishment forbidden by the Eighth Amendment." *Whitley v. Albers*, 475

2   U.S. 312, 319 (1986).  "Among 'unnecessary and wanton' inflictions of pain are those that

3   are totally without penological justification." *Rhodes v. Chapman*, 452 U.S. 337, 346

4   (1981) (citation omitted).

5         In conducting this analysis, the Court must consider the "circumstances, nature, and

6   duration" of Plaintiff's exposure to the complained of conditions. *See Hearns v. Terhune*,

7   413 F.3d 1036, 1042 (9th Cir. 2005); *Keenan*, 83 F.3d at 1089, 1091.  "The more basic the

8   particular need, the shorter the time it can be withheld."  *Hoptowit v. Ray*, 682 F.2d 1237,

9   1259 (9th Cir. 1982), *abrogated in part on other grounds by Sandin*, 515 U.S. 472.

10         **A.     Recreation**

11         In their Motion, Defendants assert that increased security protocols were necessary

12   for Plaintiff because he had "violently assaulted two officers" at ASPC-Yuma.  (*Id.*)

13   Defendants contend that any temporary delay associated with the security need for two

14   officers to be present when escorting Plaintiff does not amount to an Eighth Amendment

15   violation.  (Doc. 163 at 8.)  Defendants also argue that Plaintiff was not exposed to any

16   unconstitutional delay with respect to recreation.  (*Id.* at 9.)  They argue that because

17   Plaintiff could request that an officer refill his water bottle, water jugs could be made

18   available upon request, and Plaintiff could request to use the restroom during recreation,

19   "it is clear that [Plaintiff] had adequate access to restroom facilities and water" while he

20   was in the recreation pen and had access to ADC staff if he needed to leave the pen.  (*Id.*

21   at 10.)

22         Plaintiff has adduced evidence that recreation pens are not equipped with running

23   water or restroom facilities and that at times, staff only conduct checks every three hours.

24   Plaintiff asserted that he has been at recreation on multiple occasions where staff did not

25   conduct a check during the entire three hours Plaintiff was at recreation.  Thus, although

26   Defendants introduce evidence that prison policies indicate that prisoners should have

27   access to water and restroom facilities, Plaintiff introduces evidence based on his

28

1    experiences that creates a question of fact as to whether the policy was followed.

2        **B.    Movement Restraints**

3        Next, Defendants argue that the use of a lead chain, leg restraints, and gurney while

4    transporting Plaintiff around the prison did not amount to an Eighth Amendment violation.

5    (Doc. 163 at 11.)  They contend that Plaintiff is "precisely the type of 'dangerous' inmate

6    [who] would require heightened security restraints."  (*Id.*)

7        As discussed above, there is no dispute that Plaintiff was escorted on a gurney for

8    most of his time in ESH.  Plaintiff has adduced evidence that ESH prisoners were required

9    to sit on the gurney and lay face down on their stomachs, and straps were placed across

10   prisoners' backs and the backs of their legs, securing them to the gurney.  Defendants do

11   not contradict this evidence and state only that the gurney was used as "an extra mechanical

12   restraint to safeguard prison staff and other inmates from inmates who had committed

13   violent acts such as [Plaintiff]."  (*Id.* at 12.)

14       Moreover, Plaintiff has adduced evidence that he suffered physical and mental

15   injuries resulting from the use of the gurney.  *See Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010)

16   (noting in Eighth Amendment excessive force context that a plaintiff need not suffer

17   "significant injury" to prevail, but the extent of injury suffered by a prisoner is one factor

18   that may suggest whether the use of force could plausibly have been thought necessary in

19   a particular situation).  ADC did not discontinue the practice of escorting prisoners on a

20   gurney until December 2019 or January 2020, after Plaintiff had been in EMHS/ESH for

21   more than 18 months.

22       **C.    Cell Ventilation**

23       Defendants contend that Plaintiff "was provided with adequate ventilation when his

24   cell front was lined with plexiglass."  (*Id.* at 13.)  They argue that use of a plexiglass cell

25   front, especially when air flow is similar to cells without plexiglass, does not violate the

26   Constitution.  (*Id.*)  Defendants also note that despite concerns about prisoners throwing

27   feces, sharp objects, water, or other items at prison staff as they walk by, Plaintiff's cell is

28   no longer lined with plexiglass.  (*Id.*)  With respect to temperature, Defendants assert that

the average temperature in cells lined with plexiglass were "adequate," and in any event, Plaintiff "fails to specify any injuries he suffered personally as a result of any 'high' temperatures." (*Id.* at 15.)

Ventilation is a fundamental attribute of "shelter" and "sanitation," both of which are basic Eighth Amendment concerns. *Minifield v. Butikofer*, 298 F. Supp. 2d 900, 904 (N.D. Cal. 2004). "Inadequate 'ventilation and air flow' violates the Eighth Amendment if it 'undermines the health of inmates and the sanitation of the penitentiary.'" *Keenan*, 83 F.3d at 1090 (quoting *Hoptowit v. Spellman*, 743 F.2d 779, 784 (9th Cir. 1985), *amended*, 135 F.3d 1318 (9th Cir. 1998)).

Defendants have adduced evidence regarding the general temperature and ventilation in ESH cells, but again, that does not contradict Plaintiff's evidence regarding the conditions in *his* cell. As discussed above, Plaintiff has adduced evidence that cells in ESH have inadequate ventilation and contain "altered ventilation" systems. Plaintiff has also adduced evidence that he experienced "inhumanely hot" temperatures in his plexiglass-fronted cell between the months of May to November, that the common temperature range for cells in the ESH pod was "high 80's, low to mid-90's," and that prison administration was slow to take action unless the temperature exceeded 95 degrees. Although Defendants state that if temperatures reached any higher than 85 degrees Fahrenheit, it would "likely be due to a system breakdown," they have not presented any evidence documenting when they were aware of when temperatures in plexiglass-fronted cells exceeded 85 degrees or identified the frequency with which that occurred. And even if higher temperatures were due to a system breakdown, there is no evidence concerning how quickly any such breakdown was repaired. *See Wilson v. Seiter*, 501 U.S. 294, 305 (1991) (holding that "[s]ome conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise"); *Hutto*, 437 U.S. at 686-87 (holding that a condition of confinement that does not violate the Eighth Amendment when it exists for

just a few days may constitute a violation when it exists for "weeks or months").

> **D.  Conclusion**

The Court finds that genuine issues of fact preclude summary judgment on Plaintiff's Eighth Amendment conditions of confinement claim.  Nonetheless, because Defendants may be able to present evidence regarding the merits of Plaintiff's claims, the Court will grant Defendants leave to file a second motion for summary judgment.  *See Hoffman v. Tonnemacher*, 593 F.3d 908, 911-12 (9th Cir. 2010) (district courts have discretion to permit successive motions for summary judgment and a successive motion for summary judgment is appropriate if there is the availability of an expanded factual record).[24]

**IT IS ORDERED:**

(1)    The reference to the Magistrate Judge is **withdrawn** as to Defendants' Motion for Summary Judgment (Doc. 163).

(2)    The Motion is **granted** as follows:  Defendants Bowers and Days are dismissed as to Plaintiff's Fourteenth Amendment claim and as to Plaintiff's claims for injunctive relief regarding gurney transportation and plexiglass enclosing his cell.  The Motion is otherwise **denied without prejudice**.

(3)    On or before **November 9, 2021,** Defendants may file a new motion for summary judgment that addresses the issues discussed herein.

Dated this 28th day of September, 2021.

*Michael T. Liburdi*

Michael T. Liburdi
United States District Judge

---

[24] As to Plaintiff's claims regarding gurney transport and plexiglass enclosing the front of his cell, Defendants introduce evidence that they have discontinued those practices. (Doc. 198 at 9, 11).  To the extent that Plaintiff seeks injunctive relief to discontinue those practices, those claims are moot and will be dismissed.