**WO**                                                                                    JL

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| DaJuan Torrell Williams, | No.  CV 18-03239-PHX-MTL (CDB) |
| Plaintiff, | |
| v. | **ORDER** |
| Ernesto Trujillo, et al., | |
| Defendants. | |

Plaintiff DaJuan Torrell Williams, who is confined in the Arizona State Prison Complex-Eyman, brought this civil rights action pursuant to 42 U.S.C. § 1983 against multiple Arizona Department of Corrections ("ADC") officials.  On November 3, 2020, Defendants Shinn, Ryan, Days, Bowers, and Trujillo moved for summary judgment.  (Doc. 163.)  Plaintiff opposed the Motion, and Defendants filed a Reply (Docs. 188, 198).  On September 28, 2021, the Court granted in part and denied in part Defendant' Motion for Summary Judgment as follows: the Court dismissed Defendants Bowers and Days as to Plaintiff's Fourteenth Amendment claim and as to Plaintiff's claims for injunctive relief regarding gurney transportation and plexiglass enclosing his cell.  (Doc. 199.)  The Motion was otherwise denied without prejudice.  The Court permitted Defendants to file a new motion for summary judgment on or before November 9, 2021 that addressed the issues discussed in the Order.  (*Id.*)

On October 18, 2021, Plaintiff filed an Objection and Motion to Amend/Correct the September 28, 2021 Order.  (Doc. 200.)  After receiving two extensions of time, on January

12, 2022, Defendants filed a Motion for Summary Judgment as to Count One.  (Doc. 219.) Plaintiff was informed of his rights and obligations to respond pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc) (Doc. 221), and he opposes the Motion.  (Doc. 231.)  Defendants filed a Reply.  (Doc. 232.)  Plaintiff has also filed a Motion for Sanctions Pursuant to Federal Rule of Civil Procedure 56(h) (Doc. 224) and a Motion for Temporary Restraining Order (Doc. 229).

The Court will deny Plaintiff's Motions and grant in part and deny in part Defendants' Motion for Summary Judgment as to Count One.

## I.    BACKGROUND

Plaintiff filed the original Complaint in this case on October 9, 2018.  (Doc. 1.)  In his First Amended Complaint, Plaintiff relevantly alleges that on May 9, 2018, he was transferred to ADC Special Management Unit II and placed into an "administrative 'off the books' punishment in 'dog cluster' known as 'enhanced security' and designated as 'A51.'"  (Doc. 22 at 5.)[1]  Plaintiff alleges the conditions of confinement and increased security measures in enhanced security housing ("ESH") violate the Eighth Amendment.  (*Id.*)  Plaintiff also asserted a due process claim in Count Two with respect to his placement in enhanced security.  (*Id.*)

On screening the First Amended Complaint under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated Eighth Amendment conditions of confinement claims in Count One and a Fourteenth Amendment due process claim in Count Two.  (Doc. 26.)  The Court required Defendants Trujillo, Ryan, Days, and Bowers to answer Counts One and Two in their individual and official capacities.  (*Id.*)  The Court dismissed the remaining claims and Defendants.  (*Id.*)  Subsequently, the Court substituted Defendant Shinn for Defendant Ryan in his official capacity only and dismissed Defendant Ryan from this action.  (Doc. 90.)

As discussed above, the Court granted Defendants' first Motion for Summary

---

[1] The citation refers to the document and page number generated by the Court's Case Management/Electronic Case Filing system.

Judgment in favor Defendants Bowers and Days as to Plaintiff's claims in Count One for injunctive relief regarding gurney transportation and plexiglass enclosing his cell. (Doc. 199.) The Court denied Defendants' Motion for Summary Judgment as to the due process claim in Count Two. (*Id.*)

## II.   PLAINTIFF'S OBJECTIONS AND REQUEST TO ALTER OR AMEND

As an initial matter, in his Objections and Request to Alter or Amend the September 28, 2021 Order, Plaintiff contends the Court erred by allowing Defendants to file a second motion for summary judgment. (Doc. 200 at 1.) Plaintiff moves to alter or amend the September 28, 2021 Order pursuant to Rule 59(e) of the Federal Rules of Civil Procedure. (*Id.*) Plaintiff puts forth four reasons the Court should not have allowed Defendants to file a successive motion for summary judgment: (1) the Court has allowed Defendants to present evidence that "is/was or should have been in their possession prior to filing their first motion for summary judgement, and before judgement was entered in this case"; (2) Defendants "either do not possess the hypothetical evidence alluded to by the [C]ourt" or "were in possession of said hypothetical evidence at the time they moved for summary judgment and *they chose* not to submit it on record"; (3) the Court's Order was "open and ambiguous and does not actually reflect the [C]ourt's findings or reasoning for granting leave to file a second motion for summary judgment"; and (4) "it would be unfairly prejudicial to Plaintiff to be forced to defend against summary judgement all over again." (*Id.* at 3-8.)

Similarly, in his Response to Defendants' Motion for Summary Judgment, Plaintiff contends that the Motion is improper, frivolous, and solely intended for the purpose of delay. (Doc. 223 at 1.) Plaintiff asserts that all Defendants' arguments have previously been addressed and adjudicated by the Court, and Defendants have submitted no new evidence or facts demonstrating cause for reconsideration of these issues. (*Id.*) Plaintiff argues there are no stated facts removing or resolving any issue in dispute, and in fact, Defendants' Motion "only raises *more* questions and creates *more* issues of genuine dispute." (*Id.* at 2.) Specifically, Plaintiff contends that Defendants have confirmed that

the prison regularly conducts "temperature checks" of cells, recreation pens, and other areas, and there are logs and records of the documented temperatures, but Defendants have not produced the documentation and logs of the exact temperatures of Plaintiff's cell and the other cells in ESH to support any genuine dispute as to Plaintiff's claims of the temperatures and conditions.

In their Response to Plaintiff's Objections, Defendants contend that Rule 59(e) does not apply to Plaintiff's Objections, and his request to withdraw the Order permitting Defendants to file a second motion for summary judgment is "simply a disguised motion for reconsideration." (Doc. 201 at 2.)

Under Rule 59(e), a motion to alter or amend a *judgment* must be filed no later than 28 days after the entry of judgment. The September 28, 2021 Order was not a judgment. Thus, the Court will deny Plaintiff's request to alter or amend that Order. With respect to Plaintiff's objection to the Court permitting Defendants to file a second motion for summary judgment, as Plaintiff concedes, the Court may allow successive motions for summary judgment if there is the availability of an expanded factual record. *See Hoffman v. Tonnemacher*, 593 F.3d 908, 911-12 (9th Cir. 2010).

In the September 28, 2019 Order, the Court explicitly found that genuine issues of material fact precluded summary judgment as to Plaintiff's Eighth Amendment conditions of confinement claim. (Doc. 199 at 29.) In the conclusion (i.e., "IT IS ORDERED . . .") section of the Order, the Court stated that Defendants may file a new motion for summary judgment that "addresses the issues discussed herein." (*Id.* at 30.) The reference to the "issues discussed herein" clearly was a reference to the evidentiary issues relating to Plaintiff's conditions of confinement claims. Plaintiff's suggestion that the Court's Order allowed Defendants to readdress *any* issue discussed in the Order is specious.

In addition, in the September 28, 2019 Order, the Court identified various records that *might* exist and that *might* be in Defendants' possession. Whether or not those records exist and whether Defendants failed to produce relevant records is precisely the point of allowing Defendants to file a second motion for summary judgment. If relevant records

1    *are* available and Defendants failed to produce them, then the Court will consider the
2    absence of records in deciding the Motion for Summary Judgment.  Moreover, the Court
3    assumes for purposes of deciding the Motion for Summary Judgment that Plaintiff's
4    allegations regarding the conditions of confinement in ESH are true; the issue here is
5    whether each Defendant was personally involved in or aware of the conditions to support
6    individual liability.  Thus, the Court will deny Plaintiff's Objections and Request to Alter
7    or Amend the September 28, 2019 Order and overrule Plaintiff's objections to Defendants'
8    Motion for Summary Judgment.

9    **III.    PLAINTIFF'S MOTION FOR SANCTIONS PURSUANT TO RULE 56(H)**

10          Federal Rule of Civil Procedure 56(h) allows a court to impose sanctions against
11   parties for filing false affidavits in conjunction with a Rule 56 summary judgment motion.
12   Fed. R. Civ. P. 56(h) ("If satisfied that an affidavit or declaration under this rule is
13   submitted in bad faith or solely for delay, the court—after notice and a reasonable time to
14   respond—may order the submitting party to pay the other party the reasonable expenses,
15   including attorney's fees, it incurred as a result").  "A declaration is submitted in bad faith
16   under Rule 56(h) when it 'knowingly contains perjurious or intentionally false assertions
17   or knowingly seeks to mislead by omitting facts central to a pending issue.'"  *Arrant v.*
18   *Richardson*, No. 17-393-JVS (AGR), 2019 WL 7630864, at *4 (C.D. Cal. Dec. 10, 2019)
19   (quoting *Coble v. Renfroe*, No. C11-0498-RSM, 2012 WL 4971997, at *2 (W.D. Wash.
20   Oct. 17, 2012).  Awarding sanctions under Rule 56(h) is rare, "and the conduct involved
21   generally must be egregious."  *Raher v. Fed. Bureau of Prisons*, No. 03:09-cv-00526-ST,
22   2011 WL 4832574, at *8 (D. Ore.   2011).

23          Plaintiff moves for sanctions on the ground that the declarations of Defendants
24   Days, Bowers, Shinn, and Ryan contain false statements that they had no knowledge or
25   received no complaints about Plaintiff's conditions of confinement.  (Doc. 224 at 2-4.)
26   Plaintiff contends that grievance documents show Defendant Days responded to Plaintiff's
27   complaints about his conditions of confinement, that Defendant Bowers worked closely
28   with Days and thus would have been aware of Plaintiff's complaints, and that Plaintiff

1    submitted numerous grievance appeals to the Directors, putting them on notice of his

2    complaints. (Doc. 224 at 2-4.)   Plaintiff also challenges the authenticity of Ryan's

3    declaration and whether he had the requisite mental capacity because his declaration was

4    signed on January 6, 2022, the same day he was taken into custody and purportedly

5    admitted to a mental hospital following an incident at his home where he suffered an

6    apparent self-inflicted gunshot wound and pointed a weapon at police officers. (*Id.* at 4.)

7         In their Response, Defendants acknowledge that Days responded to grievances

8    regarding conditions of confinement at issue in this case, and they state that Days's

9    declaration statements that she had not received any verbal or written complaints about

10   these issues were made in error and should not be relied upon in the disposition of their

11   Motion for Summary Judgment. (Doc. 231 at 3-4.)   Days retracts her statements in

12   paragraphs 12, 13, and 18 of her declaration. (*Id.* at 4.) Defendants maintain that inclusion

13   of these statements in Days's declaration were due to mistake and not made with any intent

14   to deceive. (*Id.*)   As to statements made in Bowers, Shinn, and Ryan's declarations,

15   Defendants assert that there is no evidence that their statements were inaccurate or made

16   in bad faith. (*Id.* at 4-5.)  Defendants argue that Plaintiff's claim that Bowers would have

17   known about his complaints due to her working relationship with Days is speculation, and

18   there is no evidence that Shinn or Ryan ever received or signed a grievance appeal, as the

19   grievance policy allows for the Director to delegate appeal response and signature

20   authority. (*Id.* at 6.)  Finally, Defendants assert there is no evidence to support that Ryan's

21   declaration was not made with mental competency or included a forged signature. (*Id.*)

22        Defendants acknowledge the factual errors in Days's declaration and appropriately

23   retracted the subject statements.  There is no evidence that the subject statements were

24   made with intent to mislead or that Days knowingly made false statements.  As Defendants

25   point out, Days's declaration was made years after the grievance responses were prepared.

26   (Doc. 231 at 3.)  Thus, inclusion of the subject statements does not rise to the egregiousness

27   necessary to warrant sanctions.

28        As to the declarations of Bowers, Shinn, and Ryan, there is no evidence that their

1   statements are inaccurate, nor is there evidence that Days's knowledge of Plaintiff's
2   grievances was somehow imputed to the other Defendants. Also, there is no evidence that
3   Ryan's declaration was not properly signed prior to the incident that occurred later that
4   night at his home.

5       Accordingly, Plaintiff's Motions for Sanctions will be denied.

6   **IV.    SUMMARY JUDGMENT STANDARD**

7       A court must grant summary judgment "if the movant shows that there is no genuine
8   dispute as to any material fact and the movant is entitled to judgment as a matter of law."
9   Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The
10  movant bears the initial responsibility of presenting the basis for its motion and identifying
11  those portions of the record, together with affidavits, if any, that it believes demonstrate
12  the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

13      If the movant fails to carry its initial burden of production, the nonmovant need not
14  produce anything. *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099,
15  1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts
16  to the nonmovant to demonstrate the existence of a factual dispute and that the fact in
17  contention is material, i.e., a fact that might affect the outcome of the suit under the
18  governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable
19  jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S.
20  242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th
21  Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its
22  favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however,
23  it must "come forward with specific facts showing that there is a genuine issue for trial."
24  *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal
25  citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

26      At summary judgment, the judge's function is not to weigh the evidence and
27  determine the truth but to determine whether there is a genuine issue for trial. *Anderson*,
28  477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw

1    all inferences in the nonmovant's favor.  *Id.* at 255.  The court need consider only the cited

2    materials, but it may consider any other materials in the record.  Fed. R. Civ. P. 56(c)(3).

3    **V.    FACTS**

4           During the relevant time, Plaintiff was in ADC custody.  (Doc. 220 at 1 ¶ 1.)

5    Plaintiff is serving a life sentence for first-degree murder, conspiracy to commit first-

6    degree murder, attempt to commit first-degree murder, and first-degree burglary, among

7    other charges.  (Doc. 164-1 at 77.)  On May 9, 2018, Plaintiff was transferred to the

8    enhanced security housing area of the Arizona State Prison Complex ("ASPC")–Eyman,

9    Browning Unit.  (Doc. 220 at 1 ¶ 1.)

10          Defendant Shinn has been the Director of ADC since October 21, 2019.  (*Id.* at 2

11   ¶ 2.)  Former Defendant Ryan was the Director of the ADC from January 30, 2009 to

12   September 13, 2019.  (*Id.* ¶ 3.)  The Director may "[d]elegate to appropriate personnel the

13   administrative functions, powers, or duties that the director believes can be competently,

14   efficiently, and properly performed."  Ariz. Rev. Stat. § 41-1604(B)(2)(d).  Security issues

15   are delegated to the Division Director of Prison Operations, and the day-to-day operations

16   of the individual prison complexes are delegated to the complex Warden.  (Doc. 220 at 2

17   ¶ 4.)  The adequate ventilation of cells is overseen by the Complex Physical Plant

18   Supervisor.  (*Id.*)

19          Defendant Days is currently the Deputy Warden of Operations for ASPC–Florence.

20   (*Id.* ¶ 5.)  Days was the Deputy Warden of ASPC–Eyman Browning Unit in July 2017 and

21   remained in that position until March 2020.  (*Id.*)  In her position as the Deputy Warden of

22   Browning Unit, Days's responsibilities included directing and providing leadership and

23   supervision of unit activities and subordinate staff.  (*Id.* ¶ 6.)  She was also responsible for

24   developing, controlling, and reviewing unit budget and expenditure reports and oversaw

25   the development and operation of work, education, and recreational programs for prisoners.

26   (*Id.*)  Days monitored and advised complex and high-level matters throughout the

27   institution and oversaw prisoner management to include grievances, appeals, classification,

28

discipline, and transfers. (*Id.*) Days also performed security and physical plant inspections to ensure compliance with ADC policies and health, safety, and sanitation standards. (*Id.*)

From May 2018 to April 2019, Defendant Bowers was an Operations Captain assigned to ASPC–Eyman Browning Unit. (*Id.* at 2-3 ¶ 7.) Bowers was never the Chief of Security or the "Security Captain" for Browning Unit. (*Id.* at 3 ¶ 7.) As an Operations Captain at Browning Unit, Bowers was not responsible for the security operations of the Browning Unit. (*Id.* ¶ 8.) Bowers's duties pertained to supervising support services staff, which included supervising laundry, mail & property, tool control, key control, and visitation. (*Id.*)

### A.     Use of Gurneys

When Defendant Days first became Deputy Warden of Browning Unit, prisoners assigned to ESH were placed on a gurney to be escorted around the facility. (Days Decl., Doc. 220-2 at 8 ¶ 9.) The practice of using a gurney to transport prisoners in ESH was stopped in early 2020. (*Id.* ¶ 14.)

Defendant Shinn had no involvement in the transportation of ESH prisoners. (Shinn Decl., Doc. 220-2 at 3 ¶ 4.) Defendant Bowers was aware that ESH prisoners were transported on a gurney when being transported in and out of their housing area. (Bowers Decl., Doc. 220-2 at 13 ¶ 10.) However, Bowers never personally participated in transporting any prisoner, including Plaintiff, to or from ESH area in a gurney. (*Id.*)

Neither Defendant Shinn nor Defendant Bowers received or were otherwise aware of any complaints from Plaintiff, or any other prisoner, that the gurneys were not being cleaned or that they were injured while being transported on a gurney. (Shinn Decl., Doc. 220-2 at 3 ¶ 6; Bowers Decl., Doc. 220-2 at 12 ¶ 8.) Neither Shinn nor Bowers had any knowledge of, nor did they ever receive any complaints from Plaintiff or any other prisoner in ESH, that the gurneys used to transport ESH prisoners were not being cleaned. (Shinn Decl., Doc. 220-2 at 3 ¶ 6; Bowers Decl., Doc. 220-2 at 13 ¶ 9.)

On July 23, 2018, Plaintiff submitted an Inmate Informal Complaint Resolution asserting that when he was taken to the medical unit the previous week, the gurney on

which he was transported still had sweat on it from the previous prisoner.  (Doc. 186-2 at 102.)  On August 19, 2018, Plaintiff submitted an Inmate Grievance stating that the gurneys were not being wiped down and sanitized after each use.  (*Id.* at 103.)  On September 17, 2018, Defendant Days issued an Inmate Grievance Response stating that she had reviewed the documentation Plaintiff had submitted and procedures.  (*Id.* at 104.)  Days wrote that the results of her investigation indicated that the gurney was left outside the pods and the cleaning crew cleaned and sanitized it every morning.  (*Id.*)  Days also stated that supervisors were ensuring the best sanitation practices were being followed.  (*Id.*)

On September 11, 2018, Plaintiff submitted an Inmate Grievance Appeal regarding the sanitation of the gurneys.  (*Id.* at 105.)  On October 17, 2018, former Defendant Ryan issued an Inmate Grievance Appeal Response stating that Defendant Days's response was affirmed, that Unit Administration had advised that the gurney was cleaned daily by the unit cleaning crew, and that Unit Supervisors had been instructed to ensure sanitation practices were being conducted appropriately.  (*Id.* at 106.)

**B.     Recreation**

Prisoners in ESH are allowed three 2.5-hour blocks per week for recreation in the standard recreation enclosure.  (Days Decl., Doc. 220-2 at 8 ¶ 16.)  According to Plaintiff, temperatures in the recreation pens regularly reach and exceed 100 degrees, especially from April to November.  (Doc. 186-1 at 17 ¶ 82.)  From June through September, temperatures regularly reach and exceed 105 to 110 degrees.  (*Id.*)  The pod recreation pens do not have running water or restrooms.  (*Id.*)

Temperatures in the recreation enclosure in the ESH area were tested up to three times a day.  (Days Decl., Doc. 220-2 at 8 ¶ 16.)  If the temperature in the recreation enclosure reached over 100 degrees Fahrenheit during the summer months, recreation was cancelled.  (*Id.*)  Defendants do not state who performed the temperature checks.

Neither Defendant Shinn nor Defendant Bowers was involved with recreation for ESH prisoners.  (Shinn Decl., Doc. 220-2 at 3 ¶ 4; Bowers Decl., Doc. 220-2 at 13 ¶ 6.)  Neither Defendant Shinn nor Defendant Bowers ever received any complaints from

Plaintiff, or any other inmate, that officers were not conducting regular checks of the recreation enclosure, that prisoners were not having their water bottles refilled by officers while at the recreation enclosure, or that ESH prisoners were not being provided with access to the restroom while at the recreation enclosure. (Shinn Decl., Doc. 220-2 at 3 ¶ 7; Bowers Decl., Doc. 220-2 at 13 ¶ 10.)

To the best of Defendant Days's knowledge, ESH prisoners were allowed to bring a water bottle with them into the recreation enclosure. (Days Decl., Doc. 220-2 at 9 ¶ 17.) Members of the prison staff were supposed to perform a check of the recreation enclosure every 30 to 59 minutes, but ESH prisoners are often left locked in the enclosures for more than three hours due to the "resources" required for escorting ESH prisoners. (*Id.* ¶ 20; Doc. 186 at 7 ¶ 25.) A prisoner who ran out of water could request that an officer refill the bottle. (Days Decl., Doc. 220-2 at 9 ¶ 17.) A prisoner could also request to use the restroom. (*Id.*)

On May 6, 2019, Plaintiff submitted an Inmate Informal Complaint Resolution stating that because it was summer, "staff need[ed] to make sure that a water jug is present" during recreation and was brought into the pods during security walks. (Doc. 186-3 at 6.) On June 19, 2019, CO III De La Cruz sent Plaintiff an Inmate Informal Complaint Response stating that Plaintiff's concerns had been addressed with the shift supervisor. (*Id.* at 7.)

On June 23, 2019, Plaintiff submitted an Inmate Grievance stating that drinkable water was not available when he was at recreation, and because temperatures in summer regularly exceed 100 degrees, the lack of water was "extremely dangerous for [his] life, health, safety, and welfare." (*Id.* at 8.) On July 15, 2019, Defendant Days sent an Inmate Grievance Response to Plaintiff stating that she had spoken with Sergeant Ulibarri about the procedure for issuing water jugs for prisoner use in recreation. (*Id.* at 10.) Defendant Days wrote that PM shift kitchen staff have a nightly crew that collects the recreation jugs, cleans them, and refills them with ice water. (*Id.*) Days wrote that Sergeant Ulibarri had stated that there were more than 30 water jugs at Browning Unit, and if a jug ran out of

1  water, security staff would bring the jug to the kitchen, where it would be cleaned and
2  refilled.  (*Id.*)

3          **C.**      **Temperatures and Ventilation in Cells**

4         Some of the cell fronts in the enhanced management housing area had Plexiglas
5  fronts.  (Days Decl., Doc. 220-2 at 7 ¶ 4.)  Plexiglas fronts were used to safeguard prison
6  staff against prisoners throwing feces, sharp objects, or water at prison staff as they walked
7  by.  (*Id.*)  The adequate ventilation of cells at Browning Unit is overseen by the Browning
8  Unit Physical Plant Supervisor.  (*Id.* ¶ 7.)  The air flow ventilation for both Plexiglas fronted
9  cells and maximum custody general population cells at Browning Unit were tested with an
10  anemometer by correctional officers twice a day.  (*Id.*)  Although Defendant Days had no
11  direct involvement with the testing, she was informed that no significant change in air flow
12  was detected between cells with Plexiglas fronts and cells without Plexiglas fronts.  (*Id.*)

13         Temperature checks were also conducted of the ESH area within the Browning Unit
14  at least twice a day.  (*Id.* ¶ 5.)  Defendant Days was not involved with taking temperature
15  readings.  (*Id.*)  If temperatures reached 85 degrees within Browning Unit, the prisoners
16  were moved to either a holding enclosure or to the other side of the building where
17  temperatures were cooler.  (*Id.* ¶ 6.)  Days is unaware of any specific incident where the
18  temperature of Plaintiff's cell exceeded 85 degrees.  (*Id.* at 8 ¶ 9.)

19         Neither Defendant Shinn, Defendant Bowers, nor Defendant Days received or was
20  aware of any complaints from any prisoner, including Plaintiff, concerning the temperature
21  or ventilation in their cells.  (Shinn Decl., Doc. 220-2 at 3 ¶ 8; Days Decl., Doc. 220-2 at
22  8-9 ¶ 8; Bowers Decl., Doc. 220-2 at 13-14 ¶ 11.)

23  **VI.**     **EIGHTH AMENDMENT CLAIMS**

24          **A.**     **Legal Standards**

25               **1.**     **Conditions of Confinement**

26         To prevail on an Eighth Amendment conditions-of-confinement claim, a plaintiff
27  must meet a two-part test.  "First, the alleged constitutional deprivation must be,
28  objectively, sufficiently serious" such that the "official's act or omission must result in the

denial of the minimal civilized measure of life's necessities." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotations omitted).  Second, the prison official must have a "sufficiently culpable state of mind," i.e., he must act with "deliberate indifference to inmate health or safety." *Id.* (internal quotations omitted).

Deliberate indifference is a higher standard than negligence or lack of ordinary due care for the prisoner's safety.  *Id.* at 835.  In defining "deliberate indifference" in this context, the Supreme Court has imposed a subjective test: "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837 (emphasis added).

"Because routine discomfort is part of the penalty that criminal offenders pay for their offenses against society, only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (internal quotations and citations omitted).  "[T]he unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).  "Among 'unnecessary and wanton' inflictions of pain are those that are totally without penological justification." *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981) (citation omitted).

In conducting this analysis, the Court must consider the "circumstances, nature, and duration" of Plaintiff's exposure to the complained of conditions.  *See Hearns v. Terhune*, 413 F.3d 1036, 1042 (9th Cir. 2005); *Keenan v. Hall*, 83 F.3d 1083, 1089, 1091 (9th Cir. 1996). "The more basic the particular need, the shorter the time it can be withheld." *Hoptowit v. Ray*, 682 F.2d 1237, 1259 (9th Cir. 1982), abrogated in part on other grounds by *Sandin*, 515 U.S. 472.

## 2.    Supervisory Liability

There is no respondeat superior liability under § 1983, and therefore, a defendant's position as the supervisor of persons who allegedly violated Plaintiff's constitutional rights does not impose liability.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978); *Hamilton*

*v. Endell*, 981 F.2d 1062, 1067 (9th Cir. 1992); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  "Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676.

A supervisor may be liable for failure to act.  *See Maxwell v. County of San Diego*, 708 F.3d 1075, 1086 (9th Cir. 2013) (a supervisor may be liable if he participated in or directed the violation or he knew of the violation and failed to act to prevent it).  A supervisor may be liable in his individual capacity under § 1983 "if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Starr*, 652 F.3d at 1207 (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)).

Supervisory liability is direct liability, which requires the plaintiff to show that that supervisor breached a duty to the plaintiff that was the proximate cause of the injury.  *Id.* A causal connection can be "an affirmative link" between a constitutional deprivation and "the adoption of any plan or policy by [a supervisor,] express or otherwise showing [his or her] authorization or approval of such misconduct." *Rizzo v. Goode*, 423 U.S. 362, 371 (1976).  In other words, a supervisor can be liable for creating policies and procedures that violated a plaintiff's constitutional rights.  *See Hydrick v. Hunter*, 669 F.3d 937, 942 (9th Cir. 2012).

The "sufficient causal connection" may be shown by evidence that the supervisor "implement[ed] a policy so deficient that the policy 'itself is a repudiation of constitutional rights[.]'"  *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989) (citation omitted).  This type of claim against a supervisor does not fail on a state of mind requirement such as intent, knowledge, or deliberate indifference; "[a]dvancing a policy that requires subordinates to commit constitutional violations is always enough for § 1983 liability, no matter what the required mental state, so long as the policy proximately causes the harm— that is, so long as the plaintiff's constitutional injury in fact occurs pursuant to the policy." *OSU Student Alliance v. Ray*, 699 F.3d 1053, 1076 (9th Cir. 2012).

**B.     Analysis**

**1.     Use of Gurneys**

The Court has already concluded that Plaintiff has adduced evidence that he suffered physical and mental injuries resulting from the use of the gurney. (Doc. 199 at 27.) Thus, the Court must determine whether Defendants Shinn, Bowers, or Days may be held personally liable for any injuries Plaintiff suffered.

Defendants Shinn and Bowers each aver in their Declarations they were not involved with transportation of prisoners who were housed in the ESH area of Browning Unit; they were not aware of any ESH prisoner, including Plaintiff, complaining about being injured while they were transported on a gurney; and they had no knowledge, and did not receive, any complaints from any prisoner, including Plaintiff, that the gurneys used to transport ESH prisoners were not being cleaned. (Shinn Decl., Doc. 220-2 at 3 ¶¶ 4-6; Bowers Decl., Doc. 220-2 at 12 ¶¶ 7-9.) Days avers that, to the best of her knowledge, the gurneys used to transport prisoners in ESH were cleaned by correctional staff after every use. (Days Decl., Doc. 220-2 at 8 ¶ 11.) In their Reply, however, Defendants concede that Plaintiff submitted a grievance regarding the sanitation of the gurneys and that Defendant Days responded to that grievance.

**a.     Defendant Shinn**

In his Response to Defendants' Motion, Plaintiff argues that personal knowledge of his complaints should be attributed to Defendant Shinn because of "the numerous grievance appeals submitted" to Shinn. (Doc. 223 at 4.) However, based on the available evidence, the only grievance Plaintiff submitted regarding the use of gurneys was in 2018, before Shinn became ADC Director in October 2019. Plaintiff has not identified any other evidence that shows Shinn was personally aware of Plaintiff's complaints. Thus, the Court finds there is no genuine dispute of material fact regarding whether Defendant Shinn was personally aware of or involved in the response to Plaintiff's complaints about the cleanliness of the gurneys.

1      With respect to supervisory liability, Defendant Shinn was not ADC Director at the
2  time the gurney policy was implemented.  However, Shinn continued the practice of using
3  gurneys to transport ESH prisoners until December 2019 or January 2020.  (Lopez Decl.,
4  Doc. 164-1 at 168 ¶ 7.)    Thus, the Court must determine whether the practice of using
5  gurneys was "'itself is a repudiation of constitutional rights[.]'"  *Hansen*, 885 F.2d at 646.
6      The Court has already concluded that Plaintiff has adduced evidence that for most
7  of his time in ESH, prisoners were escorted around the unit on a gurney.  (Doc. 199 at 21.)
8  ESH prisoners were required to sit on the gurney and lay face down on their stomachs, and
9  straps were placed across prisoners' backs and the backs of their legs, securing them to the
10 gurney.  (*Id.*)  A reasonable jury could conclude that transporting prisoners in this manner
11 violated the prisoners' Eighth Amendment rights.  Thus, the Court will deny this portion
12 of Defendants' Motion for Summary Judgment.

13                          **b.      Defendant Bowers**

14     Based on the available evidence, the Court finds that Defendant Bowers had no role
15 in implementing any policy or procedure with respect to the use of gurneys.  There is no
16 evidence that Defendant Bowers was personally aware of or involved in any decisions
17 concerning Plaintiff's complaints about the gurneys.  Contrary to Plaintiff's suggestion, the
18 mere existence of grievances from other prisoners among ADC records cannot impute
19 personal knowledge of Plaintiff's grievances to Defendant Bowers.  Likewise, personal
20 knowledge of Plaintiff's complaints cannot be attributed to Defendant Bowers based solely
21 on Bowers's working relationship with Defendant Days.  Thus, the Court finds there is no
22 genuine dispute of material fact regarding whether Defendant Bowers was personally
23 aware of any complaints or involved in any decisions concerning the use of gurneys.

24                          **c.      Defendant Days**

25     Based on the available evidence, Defendant Days was aware of at least one
26 complaint by Plaintiff that the gurneys were not being cleaned after each use.  In their
27 Reply, Defendants admit that a genuine issue of fact exists as to whether Days had
28 knowledge of Plaintiff's concerns regarding the gurneys.  (Doc. 232 at 6.)  Defendants

1   contend that despite this knowledge, Days was not deliberately indifferent because she
2   responded reasonably to Plaintiff's concerns.  (*Id.*)

3       The Court finds Defendants Days reasonably responded to Plaintiff's grievance
4   regarding the gurneys.  The grievance response indicates that Days made a good faith effort
5   to investigate Plaintiff's concerns about the gurneys and concluded that his concerns were
6   unfounded.  *See Farmer*, 511 U.S. at 844 (prison officials who know of a risk are not liable
7   if they respond reasonably to that risk; "A prison official's duty under the Eighth
8   Amendment is to ensure reasonable safety.").  Thus, the Court finds there is no genuine
9   dispute of material fact regarding whether Defendant Days was deliberately indifferent to
10  Plaintiff's complaints about the gurneys.

11                      **2.    Recreation**

12      The Court has determined that Plaintiff has adduced evidence that recreation pens
13  are not equipped with running water or restroom facilities and that at times, staff only
14  conduct checks every three hours, and Plaintiff has introduced evidence based on his
15  experiences that creates a question of fact as to whether the recreation policy was followed.
16  (Doc. 199 at 26-27.)

17      In their Motion, Defendants contend that Defendants Shinn and Bowers had no
18  involvement with recreation for ESH prisoners.  (Doc. 219 at 6.)  Defendants Shinn and
19  Bowers each aver in their Declarations that they were unaware of any complaints by
20  Plaintiff regarding recreation.  (Shinn Decl., Doc. 220-2 at 2 ¶ 7; Bowers Decl., Doc. 220-
21  2 at 13 ¶ 10.)

22                      **a.    Defendant Shinn**

23      The available evidence indicates that Defendant Shinn was not personally aware of
24  Plaintiff's complaints about recreation.  In addition, Plaintiff filed his grievance regarding
25  recreation on June 23, 2019, before Defendant Shinn became ADC Director.  Thus, the
26  Court finds there is no genuine dispute of material fact regarding whether Defendant Shinn
27  was personally aware of Plaintiff's complaints about recreation.

28

Next, the Court must determine whether the recreation policy was "'itself is a repudiation of constitutional rights[.]'" *Hansen*, 885 F.2d at 646. A reasonable jury could conclude that regular failure to follow the recreation policy, which left prisoners without access to water and restroom facilities for up to three hours in extreme heat, violated prisoners' Eighth Amendment rights. Thus, the Court will deny this portion of Defendants' Motion for Summary Judgment.

### b.  Defendant Bowers

Based on the available evidence, Defendant Bowers was not personally aware of or involved in any decision with respect to Plaintiff's complaints about recreation. Thus, the Court finds there is no genuine dispute of material fact regarding whether Plaintiff suffered any injury attributable to Defendant Bowers with respect to recreation.

### c.  Defendant Days

It is undisputed that on June 23, 2019, Plaintiff submitted a grievance to Defendant Days expressing his concerns about recreation. The Court finds Defendants Days reasonably responded to Plaintiff's grievance regarding recreation. The grievance response indicates that Days spoke with Sergeant Ulibarri about the procedure for issuing water jugs for prisoner use in recreation, that Sergeant Ulibarri had stated that there were more than 30 water jugs at Browning Unit, and if a jug ran out of water, security staff would bring the jug to the kitchen, where it would be cleaned and refilled, and PM shift kitchen staff had a nightly crew that collected the recreation jugs, cleaned them, and refilled them with ice water. (*Id.*) The Inmate Grievance Response indicates that Defendant Days made a good faith effort to investigate Plaintiff's complaints, and it was reasonable for Days to rely on information provided by Sergeant Ulibarri regarding the water jugs. Thus, the Court finds there is no genuine dispute of material fact regarding whether Defendant Days was deliberately indifferent to Plaintiff's complaints about recreation.

### 3.  Temperature and Ventilation in Cells

### a.  Defendant Shinn

The Court has determined that Plaintiff has adduced evidence that cells in ESH have

inadequate ventilation and contain "altered ventilation" systems.  (Doc. 199 at 28.) Plaintiff has also adduced evidence that he experienced "inhumanely hot" temperatures in his plexiglass-fronted cell between May and November, that the common temperature range for cells in the ESH pod was "high 80's, low to mid-90's," and that prison administration was slow to take action unless the temperature exceeded 95 degrees.  (*Id.*) The Court also found that, although Defendants state that if temperatures reached any higher than 85 degrees Fahrenheit, it would "likely be due to a system breakdown," they have not presented any evidence documenting when they were aware of when temperatures in plexiglass-fronted cells exceeded 85 degrees or identified the frequency with which that occurred.  (*Id.* at 28-29.)  A reasonable jury could conclude that the conditions in ESH cells violated prisoners' Eighth Amendment rights.  Thus, the Court will deny this portion of Defendants' Motion for Summary Judgment.

### b.      Defendants Bowers and Days

Based on the available evidence, neither Defendant Bowers nor Defendant Days was aware of or involved in any complaint regarding the Plexiglas cell fronts or the temperature and ventilation in ESH cells.  Thus, the Court will grant Defendants' Motion for Summary Judgment on Count I as to Defendants Bowers and Days.

## VII.   MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

In his Motion, Plaintiff seeks a temporary restraining order and preliminary injunction in each of his pending cases in this Court.  (Doc. 229 at 1.)  Specifically, he seeks an injunction (1) ordering Defendants in each of his cases to immediately issue or give him access to his authorized personal property and legal materials and (2) prohibiting Defendants, absent "extraordinary circumstances," from withholding Plaintiff's personal property and legal material in excess of 72 hours when Plaintiff has active and ongoing legal matters.  (*Id.* at 6.)

As an initial matter, Plaintiff may not seek relief with respect to more than one case in a single motion.  If Plaintiff wishes to seek relief with respect to any other case, he must

do so by filing an appropriate motion in that case, not in any other case.

### A.    Motion for Temporary Restraining Order

Defendants have been heard in opposition to Plaintiff's Motion, and therefore, the provisions of Rule 65 of the Federal Rules of Civil Procedure pertaining to ex parte temporary restraining orders does not apply.  *See* Fed. R. Civ. P. 65(b).  Thus, the Court will deny Plaintiff's Motion to the extent that it seeks a temporary restraining order and will consider whether Plaintiff is entitled to a preliminary injunction.

### B.    Motion for Preliminary Injunction

Whether to grant or deny a motion for a preliminary injunction is within the Court's discretion.  *See Miss Universe, Inc. v. Flesher*, 605 F.2d 1130, 1132-33 (9th Cir. 1979).  To obtain a preliminary injunction, the moving party must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  The moving party has the burden of proof on each element of the test.  *Envtl. Council of Sacramento v. Slater*, 184 F. Supp. 2d 1016, 1027 (E.D. Cal. 2000).

An injunction is appropriate to grant "intermediate relief of the same character as that which may be granted finally," but relief is not proper when it is requested on matters lying wholly outside the issues in the suit.  *DeBeers Consol. Mines v. United States.*, 325 U.S. 212, 220 (1945).  "When a plaintiff seeks injunctive relief based on claims not pled in the complaint, the court does not have the authority to issue an injunction." *Pacific Radiation Oncology, LLC v. Queen's Med. Center*, 810 F.3d 631, 636 (9th Cir. 2015); *see Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir. 1994) (per curiam) (to obtain injunctive relief, the party "must necessarily establish a relationship between the injury claimed in the party's motion and the conduct asserted in the complaint")   An exception to this rule arises where the injunctive relief sought is related to access to the courts.  *See Prince v. Schriro, et al.*, CV 08-1299-PHX-SRB, 2009 WL 1456648, at *4 (D. Ariz. May 22, 2009) (where the relief sought relates to a prisoner's access to the court, "a nexus between the preliminary

1    relief and the ultimate relief sought is not required[,]" and the court need not consider the

2    merits of the underlying complaint) (citing *Diamontiney v. Borg*, 918 F.2d 793, 796 (9th

3    Cir. 1990)).

4          Here, Plaintiff asserted that his right to access the courts was affected because his

5    legal property was withheld after his February 3, 2022 transfer from the Yuma County

6    Detention Center back to ADC, and he had active cases with pending deadlines.  (Doc. 229

7    at 1-3.)[2]  Construed liberally, Plaintiff's claim sufficiently relates to access to the courts.

8          To maintain an access-to-the-courts claim, a prisoner must submit evidence showing

9    an "actual injury" resulting from the defendant's actions.  *See Lewis v. Casey*, 518 U.S.

10   343, 349 (1996).  With respect to an existing case, the actual injury must be "actual

11   prejudice . . . such as the inability to meet a filing deadline or to present a claim."  *Id.* at

12   348–49.  The showing required for actual prejudice is a high bar—the right of access to the

13   courts is only a right to bring petitions or complaints to the federal court and not a right to

14   discover such claims or even to litigate them effectively once filed with a court.  *See Lewis*,

15   518 U.S. at 354; *see also Cornett v. Donovan*, 51 F.3d 894, 898 (9th Cir. 1995).

16         In his Motion, Plaintiff stated that he had a February 9, 2022 deadline to file a Rule

17   10.1 Motion in his criminal case, and he needed to file a request for extension prior to that

18   date.  (Doc. 229 at 2.)  He further stated that he expected a number of decisions to be

19   handed down in various cases within days and he needed to file change-of-address notices

20   to ensure he received those orders.  (*Id.*)  Plaintiff explained that he did not have his case

21   numbers, and the prison librarian would not provide case numbers to him.  (*Id.* at 3.)

22   Plaintiff stated that, without his legal materials, he had no access to contact information for

23   his advisory or appellant counsel.  (*Id.* at 4-5.)  Plaintiff also stated that he missed the

24   February 9, 2022 filing deadline and, consequently, the Rule 10.1 Motion hearing set for

25   February 10, 2022 did not occur.  (*Id.* at 4.)

26         In his Reply, Plaintiff asserted that he "was deprived of timely receiving pleadings

27

28         [2] Plaintiff was housed at the Yuma County Detention Center from April 2020 to
     February 2022 for criminal proceedings.  (Doc. 229 at 1-2.)

1   and court orders" and that he "has been forced to request multiple extensions of time due
2   to his inability to meet deadlines[.]" (Doc. 242 at 4.) This language indicates that at some
3   point after filing his Motion, Plaintiff received his legal materials and was able to file
4   notices and requests for extensions. Plaintiff failed to provide any additional facts related
5   to his criminal case; specifically, he did not allege that he was denied an extension to file
6   his Rule 10.1 Motion. As such, Plaintiff cannot meet the high bar to show an actual injury
7   as a result of the delay in receiving his legal materials following his transfer back to ADC
8   custody.

9        To the extent Plaintiff alleges imminent harm because he will be subject to future
10   transfers between Yuma Detention Center and ADC due to his ongoing criminal
11   proceedings, and he will likely be denied his necessary legal materials after those transfers,
12   such harm is speculative, which is insufficient to support injunctive relief. *Caribbean*
13   *Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (speculative injury
14   is not irreparable injury sufficient for a preliminary injunction).

15        For the above reasons, Plaintiff's Motion for Preliminary Injunction will be denied.

16   **VIII.   CONCLUSION**

17        Accordingly.

18   **IT IS ORDERED:**

19        (1)    The reference to the Magistrate Judge is **withdrawn** as to Plaintiff's
20   Objection and Motion to Amend/Correct the September 28, 2021 Order (Doc. 200),
21   Defendants' Motion for Summary Judgment as to Count I (Doc. 219), Plaintiff's Motion
22   for Sanctions (Doc. 224), and Plaintiff's Motion for Temporary Restraining Order and
23   Preliminary Injunction (Doc. 229).

24        (2)    Plaintiff's Objection and Motion to Amend/Correct the September 28, 2021
25   Order (Doc. 200), Motion for Sanctions (Doc. 224), and Motion for Temporary Restraining
26   Order and Preliminary Injunction (Doc. 229) are **denied**.

27        (3)    Defendants' Motion for Summary Judgment as to Count I (Doc. 219) is
28   **granted** as to Defendants Bowers and Days. The Motion is **denied** as to Defendant Shinn.

(4)     Defendants Bowers and Days are **dismissed**.

(5)     The remaining claims are the Eighth Amendment claims for money damages in Count I against Defendants Shinn and Trujillo; the claim in Count I for injunctive relief with respect to recreation against Defendant Shinn in his official capacity; and the Fourteenth Amendment claim in Count II against Defendants Shinn and Trujillo regarding Plaintiff's placement in enhanced security.

(6)     This action is referred to Magistrate Judge John Z. Boyle to conduct a settlement conference.

(7)     Defendants' counsel shall arrange for the relevant parties to jointly call Magistrate Judge Boyle's chambers at (602) 322-7670, or email at boyle_chambers@azd.uscourts.gov, within 14 days to schedule a date for the settlement conference.

Dated this 19th day of April, 2022.

Michael T. Liburdi
United States District Judge